**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CHICAGO TEACHERS UNION, LOCAL 1, AMERICAN FEDERATION OF TEACHERS, AFL-CIO; DONALD L. GARRETT JR. and EDWARD V. SCOTT, individually and on behalf of all similarly situated persons, | ) ) ) ) ) ) | Case No. |
| | ) | JURY TRIAL DEMANDED |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| BOARD OF EDUCATION OF THE CITY OF CHICAGO, a body politic and corporate, | ) ) ) ) | |
| Defendant. | ) ) | |

**COMPLAINT**

Plaintiffs, the  Chicago Teachers Union ("CTU") and Edward Scott, an individual ("the CTU, Mr. Scott and collectively, "Plaintiffs"), by and through their attorneys, Robin Potter & Associates, P.C., and on behalf of themselves and all other similarly situated persons complain against Defendants Board of Education of the City of Chicago ("Board" "BOE" or "Defendants") as follows.

**SUMMARY OF CLAIM**

1.      This is an action under Title VII of the Civil Rights Act of 1964, as amended by the 1991 Civil Rights Act, 42 U.S.C. Sec. 2000e seq. and under 42 U.S.C. §§1981 and 1983 for violation of plaintiffs' rights of Equal Protection under the Fourteenth Amendment and to redress defendant's ongoing pattern & practice of racially discriminatory employment practices and policies.  Defendant continues to engage in a policy, pattern or practice of race discrimination against a class of African

American teachers and para-professional staff, by targeting South and West side schools with disproportionately higher African American teachers and staff for "turnaround," resulting in the termination of all employees of the schools, bar none.

2.    On August 7, 2015, the United States Court of Appeals for the Seventh Circuit ordered that a class be certified in related cause. Case no. 12 C 10331 is pending in this Court and challenges the 2012 Turnarounds as racially discriminatory. See, *CTU v. BOE*, No. 14-2843, 2015 WL 4667904 (7th Cir. Aug. 7, 2015).

**PRELIMINARY STATEMENT**

3.    Defendant operates the Chicago Public School system ("CPS"), consisting currently of approximately 660 schools of which 517 are schools run by the Board, 130 are privately run charters, 11 are contract schools and 15 are Safe or alternative schools. CPS services 400,000 students in each of Chicago's 77 neighborhoods.

4.    By the fall of 2014, approximately 90% of the students educated in CPS's schools were minorities, of which 39.3% are identified as African American and 9.4% are white.[1]

5.    CPS is currently divided into four (4) geographic networks: Far South, South Side, Southwest Side and West Side. Most of CPS's African American teachers are employed in South and West side schools.

6.    The African American teaching force in CPS as a percentage of the overall teaching population has steadily declined, from 40.6% in 2000 to 29.6% in 2010. In 2011, African American teachers were approximately 28.7% of the tenured teaching

---

[1]    See: http://www.cps.edu/About_CPS/At-a-glance/Pages/Stats_and_facts.aspx

population. By the fall of 2014, of the 22,519 teachers at CPS, 24.3% were African-American and 49.7% were white.

7.     The drastic decline in African American teachers corresponds directly with Defendant's intentional actions, policies and practices that have phased out, closed, combined or reconstituted purportedly poor performing schools and in the African-American community.

8.     Defendant's actions constitute a policy and practice of discrimination on the basis of race.

9.     From 2001 to 2009, under a practice begun by then CEO Arne Duncan Defendant BOE closed roughly 86 schools, and in 2013, it closed another 49 schools and turned around five (5) schools. Although the average racial mix of the population of all schools is 41.6% black, 88.6% of the schools closed were black.

10.     From 2006 to present, approximately 34 schools have been subjected to "turnaround", also known as reconstitution, a process in which all faculty and staff from a school are dismissed and replaced.[2]

11.     Defendant's turnarounds have occurred exclusively in the South and West side neighborhoods, disproportionately affecting African American teaching and staff. `

12.     On or about February 22, 2012, Defendant BOE authorized the turnaround of 10 CPS schools, resulting in the termination of 347 tenured teachers, in addition to staff.  African Americans constituted approximately 51% of the tenured teachers terminated,  despite making up less than 30% of all CPS tenured teachers.

---

[2]     See Illinois School Code, 105 ILCS 5/34-8.3(d).

13.     In April 2013, defendant BOE authorized the turnaround of five CPS schools, resulting in the termination of 127 teachers and 27 paraprofessional staff.

14.     In 2013, there were 148 schools on Probation, due to their Level 3 status. As set forth in the table below, African American teachers and staff constituted both a significantly less percentage and average of all teachers and staff, as compared to their numbers in the turnaround displaced class.

| Year | # Probation Level 3 Schools | Avg % Black Teachers (% black averaged across all schools) | Total % Black Teachers (percentage across all schools) | Avg % Black Staff (% black averaged across all schools) | Total % Black Staff (percentage across all schools) |
|------|------|------|------|------|------|
| 2013 | 148 | 51% | 45% | 53% | 48% |
| 2014 | 127 | 48% | 44% | 52% | 47% |

15.     African Americans constituted approximately 73% of the tenured teachers terminated in the 2013 turnarounds, despite making up less than 25% of all CPS tenured teachers. The actual school totals of the % of African American teachers terminated were higher, and ranged from 59-81 percent. See table below.

| Total Number of Teachers Affected by Turnaround, School (2013) | | | 2013 |
|------|------|------|------|
| | Race | % of Total Teachers | # of Total Teachers |
| Chalmers | White | 20% | 4 |
| | Black / African American | 70% | 14 |
| | Other | 10% | 2 |
| Dewey | White | 23% | 5 |
| | Black / African American | 59% | 13 |

|  | Other | 18% | 4 |
|---|---|---|---|
| O'Keeffe | White | 19% | 6 |
|  | Black / African American | 74% | 23 |
|  | Other | 6% | 2 |
| Lewis | White | 28% | 8 |
|  | Black / African American | 62% | 18 |
|  | Other | 10% | 3 |
| Carter | White | 14% | 3 |
|  | Black / African American | 81% | 17 |
|  | Other | 5% | 1 |

16.     Defendant's pattern and practice of intentionally targeting schools with high African American teaching and staff populations for turnaround constitutes disparate treatment and also has a disparate impact on African American staff.

## CLASS DEFINITION

17.     Plaintiffs bring this case as a class action under Federal Rules of Civil Procedure 23(a), (b)(2) and (3) and (c)(4), on behalf of the following class:

> All African American persons employed by the Board of Education of the City of Chicago as a teacher or para-professional staff, as defined in the labor agreement between the Chicago Teachers Union and the Board of Education, in any school or attendance center subjected to reconstitution, or "turnaround," on or after the 2011 calendar year.

## PARTIES

### *Chicago Teachers Union*

18.     Plaintiff CTU is a labor organization within the meaning of Section 2(c) of the Illinois Educational Labor Relations Act, 115 ILCS 5/2(c), representing over 30,000 professional educators and Board employees, the vast majority of the unionized workforce in CPS. It is the exclusive bargaining representative for all teachers and

paraprofessional and Professional School Related Personnel ("PSRP") in CPS. The CTU brings this action in its associational capacity to assert the constitutional and statutory rights of its members and the class.

**Edward W. Scott**

19.     Mr. Scott is an African American male.

20.     Mr. Scott was employed at CPS as a clerk from 2009 until laid off in 2013. Between 2012-13, Mr. Scott was a paraprofessional/Clerk at Dewey Elementary Academy of Fine Arts (Dewey).

21.     In about June, 2013, Mr. Scott was terminated from his employment at Dewey.

22.     Defendant turned Dewey over to the Academy for Urban School Leadership (AUSL) to operate as a turnaround contractor. Mr. Scott applied for his position at Dewey, but was not granted an interview, nor was he hired.

*Defendant*

23.     Defendant Board is a body politic and corporate, organized under the State of Illinois School Code, 105 ILCS 5/34-1. It was at all relevant times an "employer" within the meaning of the Title VII.

24.     Defendant Board is an educational employer within the meaning of Section 2(a) of the Illinois Educational Labor Relations Act, 115 ILCS 5/2(a), is or was the employer of the plaintiffs and the class, and is the entity charged by law with maintaining a free public school system within the City of Chicago.

**JURISDICTION, VENUE AND ADMINISTRATIVE REQUIREMENTS**

25.     This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. §1331 and under 28 U.S.C. §1343 for claims for deprivation of constitutional rights under 42 U.S.C. §1983 and §2201.

26.     Venue is proper in this judicial district under 28 U.S.C. §1391(b) as the facts and events giving rise to Plaintiffs' claims occurred in this judicial district and all defendants reside or maintain offices within this judicial district.

27.     Plaintiffs timely filed charges with the Equal Employment Opportunity Commission ("EEOC") on October 4, 2014, and timely filed this Complaint within 90 (ninety) days of receipt of their Right to Sue letters. See Group Exhibit "A," attached.

**FACTUAL & HISTORICAL BACKGROUND**

28.     Chicago Public Schools employ approximately 23,000 teachers in their 578 schools (excluding charters, non-CPS turnarounds or non-CPS performance schools). 560 of the 578 schools are eligible for probation under the Board's 2012 guidelines.  186 schools, or about 33%, of these schools were on probation and labeled as "failing" during the 2011-2012 school year; 148 schools in 2013, and 127 schools in 2014. These failing schools are not limited to a specific geographic location, but are scattered across the city.

29.     In 2004, in an effort to fix failing schools, defendant began selecting schools for "school action."  School actions have included turnarounds or reconstitution, or other extreme intervention procedures purportedly intended to place students attending the schools in a better position to achieve academic success.

30.     In a "turnaround" school, all administration, faculty and staff are terminated and Local School Council ("LSC")[3/], the statutory state entity overseeing the administration of the school, is dissolved.  The staff and faculty may re-apply for a position with the school.  Historically, less than half of all teachers terminated as a result of turnarounds are rehired by the school.[4/]

## A.     History of the "Turnaround"

31.     Turnarounds were introduced in the City of Chicago in approximately 2004 as part of the "Renaissance 2010" program of former Mayor Richard Daley.

32.     Renaissance 2010 sought the creation of 100 new schools by 2010, as charter, contract or performance schools.

33.     Renaissance 2010 sought the closing or "turnaround" of dozens of schools.

34.     From 2004 through 2011, Defendants ordered the following 16 schools to be subjected to turnaround[5/]:

---

[3/]     The LSC is a body authorized by the Illinois School Code, 105 ILCS 5/34-2.1, for every CPS operated school that has not been subject to school action. The LSC is mandated to evaluate the performance of the school principal, to approve school expenditures and advise the principal on educational, student disciplinary and safety issues within the school.  105 ILCS, 5/34-2.3 *et seq*.

[4/]     de la Torre, M., Allesworth, E., Jagesic, S., Sebastian, J., Salmonowicz, M., Meyers, C. & Gerdeman, R.D. (2012). *Turning Around Low-Performing Schools in Chicago*. University of Chicago Consortium on Chicago School Research & American Institutes for Research.

[5/]     See attached Exhibit B, a map of schools subjected to turnaround based on the operator of the school from 2006 to present.

|  | Name of School | Location | Turnaround Year | CPS Network |
|---|---|---|---|---|
| 1 | William T. Sherman Elementary School | 1000 W. 52nd St. Chicago, IL 60609 | 2006 | Pershing |
| 2 | John Harvard Elementary School | 7525 S. Harvard Ave. Chicago, IL 60620 | 2007 | Skyway |
| 3 | William Rainey Harper High School | 6250 S. Wood St. Chicago, IL 60636 | 2008 | Englewood-Gresham |
| 4 | Robert Fulton Elementary School | 5300 Hermitage Ave. Chicago, IL 60609 | 2008 | Pershing |
| 5 | Nicholas Copernicus Elementary School | 6010 S. Throop St. Chicago, IL 60636 | 2008 | Englewood-Gresham |
| 6 | Morton Career Academy | 431 N. Troy St. Chicago, IL 60612 | 2008 | Garfield-Humboldt |
| 7 | Julia Ward Howe Elementary School | 720 N. Lorel Ave. Chicago, IL 60644 | 2008 | Austin-North Lawndale |
| 8 | Fenger High School | 11220 S. Wallace Chicago, IL 60628 | 2009 | Far South Side |
| 9 | Bethune Elementary School | 3030 W. Arthington Chicago, IL 60612 | 2009 | Garfield-Humboldt |
| 10 | Johnson Elementary School | 1420 S. Albany Chicago, IL 60623 | 2009 | Austin-North Lawndale |
| 11 | Dulles Elementary School | 6311 S. Calumet Chicago, IL 60637 | 2009 | Burnham Park |
| 12 | George W. Curtis Elementary School | 32 E. 115th St. Chicago, IL 60628 | 2010 | Rock Island |
| 13 | Charles S. Deneen Elementary School | 7257 S. State St. Chicago, IL 60628 | 2010 | Skyway |
| 14 | Myra Bradwell Elementary School | 7736 S. Burnham Chicago, IL 60649 | 2010 | Skyway |
| 15 | Wendell Phillips High School | 244 E. Pershing Rd. Chicago, IL 60653 | 2010 | West Side |

| 16 | John Marshall High School | 3250 W. Adams St. Chicago, IL 60624 | 2010 | West Side |

35.    Each school in paragraph 34, *supra*, is located in the South or West sides of Chicago[6/].

36.    No schools from the O'Hare, Fullerton or Ravenswood-Ridge network of elementary schools, all located on the North side of the City, has ever been subjected to turnaround, or any other school action.

37.    No schools from the North-Northwest Side network of high schools, all located in the North side of the City, has ever been subjected to turnaround, or any other school action.

**B.    Turnaround Process**

38.    The Illinois School Code, 105 ILCS 5/34-8.3(d), provides in relevant part regarding remediation and probation of schools, including turnaround actions:

(D)    Schools placed on probation, that, after a maximum of one year, fail to make adequate progress in correcting deficiencies are subject to the following actions by the general superintendent with the approval of the board, after opportunity for a hearing:

(1)    Ordering new local school council elections.
(2)    Removing and replacing the principal.
(3)    Replacement of faculty members, subject to the provisions of Section 24A-5 (105 ILCS 5/24A-5).
(4)    Reconstitution of the attendance center and replacement and reassignment by the general superintendent of all employees of the attendance center.
(5)    Intervention under Section 34-8.4 (105 ILCS 5/34-8.4) - (5.5) Operating an attendance center as a contract turnaround school.

---

[6/]    As used herein, south and west side schools refer to all schools that are not located in the North-Northwest High School network or corresponding elementary school networks of Ravenswood-Ridge, O'Hare and Fullerton.

39.     No provision of the Illinois School Code, or any other state statute or city ordinance, states the specific criteria for selecting schools for turnaround.

40.     In every instance in which a school is subject to turnaround, Defendant terminated all employees of the school.

41.     Following a turnaround, the school is then turned over to one of two entities to operate: (1) the CPS Office of School Improvement ("OSI"), or (2) the Academy for Urban School Leadership ("AUSL").

42.     If the school is operated by OSI or AUSL, it remains subject to the terms of the labor agreements negotiated by the Board and local unions.

43.     If, the school is turned over to AUSL, a private entity, it is no longer subject to all the same policies and Board Rules applicable to CPS operated schools.

44.     In either instance, turnaround schools are given authority to hire new employees for every position in the school, including teachers and para-professionals.

45.     Schools subject to turnaround are not governed by Local School Councils.

46.     The Illinois School Code requires that CPS establish Local School Councils for every school.  Local School Councils are given the authority to, among other things, select the principal of the school and determine how funds given to the school will be disbursed. 105 ILCS 5/34-2.3. See also, n. 3, *supra*.

47.     The Local School Council is comprised of members from the community, teachers, parents, students and the principal.  105 ILCS 5/34-2.1.

48.     Prior to 2006, no specific criteria was promulgated for the turnaround of schools.

49.     In February 2006, CPS recommended the turnaround of Sherman Elementary School, on the grounds that it met the statutory criteria for school closings.

50.     CPS relied on Board Policy 04-0225-PO2, setting forth the following criteria for selecting schools to be closed:

      i.      Probation - The school had been on probation for a year;

      ii.     Illinois Standard Achievement Test ("ISAT") - 25% or fewer students achieved a score that meets or exceeds state standards for the previous year;

      iii.    4-year Average Score - The four-year average ISAT score of students who meet or achieve the state standard is at or below 25%;

      iv.     Student Gains - The four-year average of students on the Iowa Test of Basic Skills ("ITBS") showed gains of less than 0.9, where 1.0 is the equivalent of one year of academic progress.

51.     Only Sherman Elementary School was subjected to "turnaround" pursuant to the above criteria in 2006.

52.     In about 2006, defendant's former Chief Executive Officer ("CEO") Arne Duncan changed and published criteria specifically for the eligibility of schools for turnaround, as follows:

      i.      Probation - The school had been on probation for a year;

      ii.     Illinois Standard Achievement Test ("ISAT") - 30% or fewer students achieved a score that meets or exceeds state standards for the previous year;

      iii.    4-year Average Score - The four-year average ISAT score of students who meet or achieve the state standard is at or below 25%;

      iv.     Student Gains in Reading- Less than 30% of the students made expected year-to-year gains on standardized tests over the course of the previous two school years;

-12-

   v.  Student Gains in Math - Less than 30% of the students made expected year-to-year gains on standardized tests over the course of the previous two school years.

53. In 2007, only John Harvard Elementary School was subjected to "turnaround" pursuant to the above criteria.

54. On December 19, 2007,  then CEO of CPS Arne Duncan changed, and published a new set of criteria for the eligibility of schools for turnaround, as follows:

   i.  Probationary History;

   ii.  The school is one of the lowest performing in the district;

   iii.  Low performance is consistent over time;
   iv.  Low performance is consistent across subjects;

   v.  Students at the school are not catching up;

   vi.  The school is part of cluster of other schools proposed for turnaround;

   vii.  Turnaround is in the best interest of the students.

55. In 2008, five schools were subjected to turnaround pursuant to the above criteria.

56. On December 17, 2008, former CPS CEO Duncan published a new set of criteria for the eligibility of schools for turnaround, identical in all respects to the criteria set forth above except omitting from the published criteria, whether the school was part of a cluster of other schools proposed for turnaround.

57. In 2009, four schools were subjected to turnaround pursuant to the above criteria.

58. On December 16, 2009, new CPS CEO Ron Huberman published a new set of criteria for the eligibility of schools for turnaround, as follows:

i.      Schools receiving less than 33.3% of the possible "performance points," established by the CPS School Performance, Remediation and Probation Policy, for two consecutive years.

59.     Performance Points were distributed to elementary schools pursuant to the following factors: (1) ISAT[7/] Reading scores, (2) ISAT Mathematics Scores, (3) ISAT Science Scores, (4) ISAT Composite Scores[8/] for all grade levels, (5) ISAT Composite Scores for the highest grade level at the school, (6) Attendance, (7) Value-Added[9/] ISAT Reading Scores, and (8) Value-Added ISAT Mathematics scores.

60.     Performance Points were distributed to high schools pursuant to the following factors: (1) drop-out rate, (2) freshman "on-track" percentage[10/], (3) PSAE[11/] reading scores, (4) PSAE math scores, (5) PSAE science scores, (6) Attendance, (7) AP class enrollment, (8) student Advanced Placement test scores, (9) Student EPAS[12/] reading gains, and (10) Student EPAS math gains.

---

[7/]     The ISAT is a state standardized test that was administered to students in grades three through eight in Reading and Mathematics and grades four through seven in Science. It has since been abandoned by CPS.

[8/]     Composite Scores are calculated by taking the adding together a students score on each test and dividing the total by the number of tests taken.

[9/]     Value-Added Scores are calculated pursuant to a formula which measures a students scores as a function of student characteristics, grade level and prior performance.

[10/]    "On-track" percentage refers to the percentage of freshman students within a high school receiving no more than one F grade in a core subject per semester and who earn at least five course credits their freshman year.

[11/]    PSAE refers to the Prairie State Achievement System given to all Illinois 11th graders, a two-day test that includes the ACT.

[12/]    EPAS refers to the Educational Planning and Assessment System, a three test metric of a student's educational progress and college readiness.

61.    Five schools were subjected to turnaround pursuant to the above criteria.

62.    On August 22, 2011, former Illinois Governor Patrick Quinn signed into law P.A. 97-0474, which in relevant part, defined "School closing" or "school closure" as "the closing of a school, the effect of which is the assignment and transfer of all students enrolled at that school to one or more designated receiving schools," and "school actions" to include "school closing; school consolidation; co-location; boundary change that requires the reassignment of students, unless the reassignment is to a new school with an attendance area boundary and is made to relieve overcrowding; or phase-out." 105 ILCS 5/34-200.  The terms "turnaround" and "reconstitution" are not specifically referenced in the definition of school closing or closure.

63.    P.A. 0474 required Defendant CEO to publish criteria for "school actions" by November 1 of each year and announce all proposed school actions by December 1 of each year.  105 ILCS 5/34-230.

64.    On November 29, 2011, former CPS CEO Jean Claude-Brizzard published a new set of "Guidelines for School Actions." The terms "turnaround" and "reconstitution" are not specifically listed in the CEO's listing of "school actions."

65.    On November 30, 2011, CEO Brizard announced that five schools would be closed, two schools would be phased out, three schools would be co-located and 10 schools would be subjected to turnaround

66.    Defendant has not made public the criteria which the Board would use to select schools for turnaround.

67.    Of the 10 schools selected for turnaround in 2012, four are managed by CPS's OSI and six are managed by AUSL.

68.     When a neighborhood school is turned over to AUSL by defendants, AUSL is vested with administrative autonomy, is no longer subjected to all CPS policies, Board rules or labor agreements entered into between Defendants and unions.

69.      AUSL is responsible for the re-hiring of employees at Turnaround schools.

70.     AUSL currently administers about 25 turnaround schools.

71.     Former BOE member David Vitale was the former Chairman of the Board of AUSL. He served as BOE President per his appointment and removal by Mayor Emanuel in 2011 and 2015, respectively. During his tenure, he authorize the entrustment of over 10 CPS schools to AUSL, including 5 in 2013.

72.     Prior to Vitale's appointment to BOE, 12 CPS schools were turned over to AUSL over the course of five years.

73.     In the spring of 2011, Tim Cawley, former AUSL Managing Director of Finance and Administration, was hired by defendants as the Chief Operations Officer (COO) of CPS.  Mr. Cawley has overseen the transfer of over 10 turnaround schools from CPS to AUSL since 2011.

**C.     2012 Turnarounds**

74.     On November 30, 2011, former CPS CEO Jean-Claude Brizard recommended the "turnaround" of following 10 public schools by July 1, 2012:

|   | Name | Location | CPS Network |
|---|------|----------|-------------|
| 1 | Pablo Casals Elementary School | 3501 W. Potomac Ave. Chicago, IL 60651 | Garfield-Humboldt |
| 2 | Fuller Elementary School | 4214 S. Saint Lawrence Ave. Chicago, IL 60653 | Burnham Park |

-16-

| 3 | Herzl Elementary School | 3711 W. Douglas Blvd. Chicago, IL 60623 | Austin-North Lawndale |
| 4 | Marquette Elementary School | 6550 S. Richmond St. Chicago, IL 60629 | Midway |
| 5 | Piccolo Elementary School | 1040 N. Keeler Ave. Chicago, IL 60651 | Garfield-Humboldt |
| 6 | Amos Alonzo Stagg Elementary School | 7424 S. Morgan St. Chicago, IL 60621 | Englewood-Gresham |
| 7 | Chicago Vocational Career Academy High School | 2100 E. 87th St. Chicago, IL 60612 | South Side |
| 8 | Tilden Career Community Academy High School | 4747 S. Union Chicago, IL 60609 | Southwest Side |
| 9 | Woodson South Elementary School | 4414 S. Evans Chicago, IL 60653 | Burnham Park |
| 10 | Wendell Smith Elementary School | 744 E. 103rd St. Chicago, IL 60628 | Lake Calumet |

75.     Following former CEO Brizard's listing of the above 10 schools for turnaround, evidence was presented to a hearing officers to make recommendations to Defendant BOE on whether to subject the schools to turnaround.

76.     CPS relied on the following criteria to justify turnaround of the above 10 schools:

(i)      years on probation
(ii)     percentage of possible performance points accumulated,
(iii)    ISAT testing results in elementary schools,
(iv)     graduation rates in high schools, and
(v)      the level of administrative support and resources given to the school.

77.     In recommending turnaround of each of the above 10 schools, defendant's hearing officers relied on the above criteria set forth above.

-17-

78. In assessing the number of years a school had been on probation, the hearing officers took into account the number of consecutive years the school had received a Level 3 achievement rating, the lowest CPS school performance rating.

79. Annually, CPS schools are given one achievement rating, as follows:

- Level 1: For an elementary school, receiving 30 Performance Points, roughly 71%; for a high school, receiving 28 Performance Points, roughly 66.7%.
- Level 2: For an elementary school, receiving between 21 and 29 Performance Points, roughly 50% to 70.9%; for a high school, receiving between 18.66 and 27.66 Performance Points, roughly 44% to 66.67%.
- Level 3: For an elementary school, receiving 20 or fewer Performance Points, or less than 50%; for a high school, receiving 18.33 or fewer Performance Points, or less than 44%.

80. Schools achieving a Level 3 achievement rating are placed on probation.

81. In assessing the percentage of possible performance points accumulated, the hearing officers relied on the Performance system implemented by the Board in which schools accumulate points based on their performance.

82. For elementary schools, Performance Points are distributed based on the following categories, with a possible of 42 total points:

- ISAT Mathematics - 3 possible points exist based on the percentage of students who meet or exceed state standards on the mathematics portion of the test; 3 possible points exist based on percentage improvement in students who meet or exceed state standards from the previous year.

- ISAT Reading - 3 possible points exist based on the percentage of students who meet or exceed state standards on the reading portion of the test; 3 possible points exist based on percentage improvement in students who meet or exceed state standards from the previous year.

- ISAT Science - 3 possible points exist based on the percentage of students who meet or exceed state standards on the science portion of the test; 3 possible points exist based on percentage improvement in students who meet or exceed state standards from the previous year.

- ISAT Composite - 3 possible points exist based on the percentage of students who exceed state standards on the composite ISAT score; 3 possible points exist based on percentage improvement in students who exceed state standards from the previous year.

- ISAT Composite - Highest Grade Student - 3 possible points exist based on the percentage of students in the school's highest grade level who exceed state standards on the mathematics portion of the test; 3 possible points exist based on percentage improvement in students who exceed state standards from the previous year.

- Attendance - 3 possible points exist based on the percentage of students who attend class; 3 possible points exist based on percentage improvement in students who meet or exceed state standards from the previous year.

- Value-added ISAT reading - 3 possible points exist based on the number of standard deviations above the district average the school's average reading scores are.

- Value-added ISAT Mathematics - 3 possible points exist based on the number of standard deviations above the district average the school's average mathematics scores are.

- Value-added ISAT Science - 3 possible points exist based on the number of standard deviations above the district average the school's average science scores are.

83.     In assessing support and resources, the hearing officers relied on CPS testimony and evidence regarding funds and resources purportedly provided the school during its probationary period.

84.     On February 22, 2012, Defendant determined to turnaround each of the 10 schools listed in ¶74, above.

85.     Effective July 2012, Defendant terminated the employment of all administrators, faculty and staff at each of the 10 schools referenced in ¶74 above.

86.     Similarly situated to the preceding 16 schools, each of the schools selected for turnaround on February 22, 2012, is located on the South or West side.

-19-

**C. 2013 Turnarounds**

87. Pursuant to the recommendation of former CPS CEO Barbara Byrd-Bennett and due to alleged poor performance and AUSL's request to operate more public schools, the following 5 neighborhood public schools were turned around and turned over to AUSL in 2013:

| | Name | Location | CPS Network |
|---|---|---|---|
| 1 | William Carter Elementary School | 5740 South Michigan Ave. Chicago, IL. 60637 | Burnham Park |
| 2 | Thomas Chalmers Specialty Elementary School | 2745 W. Roosevelt Road Chicago, IL. 60608 | Austin-North Lawndale |
| 3 | Leslie Lewis Elementary School | 1431 N. Leamington Ave Chicago, IL 60651 | Austin-North Lawndale |
| 4 | Okeeffe Elementary School | 6940 S. Merrill Ave Chicago, IL 60649 | Skyway |
| 5 | Dewey Elementary Academy of Fine Arts | 5415 S. Union Ave Chicago, IL 60609 | Pershing |

88. Although allegedly closed for poor performance, each of the five schools experienced gains in reading scores and other metrics. Chalmers had new and successful leadership, increased its ISAT scores and had moved up from a Level 3 to a Level 2 school.

89. Under AUSL's leadership and control, Chalmers has suffered reduction from a Level 2 to a Level 3 School.

90. At the same time as defendant ordered the above 5 schools turned over to AUSL in 2013, it appropriated in the CPS supplementary capital budget, an additional $11 million for improvements to the schools.

91.     Pursuant to the recommendation of former CPS CEO Barbara Byrd-Bennett

and the vote of defendant Board on April 23, 2014, the following 3 neighborhood public

schools were turned around in 2014:

|   | Name | Location | CPS Network |
|---|------|----------|-------------|
| 1 | Dvorak Technology Academy | 3615 W, 16th Street Chicago, IL. | North Lawndale |
| 2 | Walter Gresham Elementary School | 8524 S. Green Street Chicago, IL. | Auburn-Gresham |
| 3 | Ronald McNair | 4820 W. Walton Street Chicago, IL | Auburn-Gresham |

### D.  Turnaround Results

92.     Turnarounds do not conclusively result in improved student performance.

93.     On or about February 2012, The University of Chicago's Consortium on

Chicago School Research ("CCSR") released a summary report on the effectiveness of

subjecting schools to turnarounds. It concluded that turnaround schools show small gains

in achievement in mathematics and reading in elementary schools, and no difference in

student performance in high schools[13].

94.     The CCSR study did not control for increased resources and funds allocated to

schools after defendants selected the schools for turnaround.

---

[13]     de la Torre, M., Allesworth, E., Jagesic, S., Sebastian, J., Salmonowicz, M., Meyers, C. & Gerdeman, R.D. (2012). *Turning Around Low-Performing Schools in Chicago*. University of Chicago Consortium on Chicago School Research & American Institutes for Research.

95.     Defendant's COO Mr. Cawley stated: "if we think there's a chance that a building is going to be closed in the next five to 10 years, if we think it's unlikely it's going to continue to be a school, we're not going to invest in that building."[14]

96.     In comparison, schools selected for turnaround on February 22, 2012, received roughly $20 million in additional funding and capital investments in infrastructure.[15]

97.     Defendant's COO Mr. Cawley stated with respect to disproportionate funding for turnaround schools: "We believe that we get more bang for our capital investment buck when we couple it with a program change in the building."[16]

98.     The CCSR study and defendant's turnaround policies and practices have been criticized.  Geoffery Borman, Professor of Education and Sociology at the University of Wisconsin-Madison, stated: "There are many limitations to this study and if one were to take a true, critical eye at these results, they do not conclusively show these reforms caused these schools to turn around in the way described in the report."

99.     Dan McCaffery, a statistician for the Rand Corporation, criticized the study for failing to control for changes in student populations, stating "[s]hifting students and changing labels is not a legitimate way to improve a school."[17]

---

[14]     Lipman, P., Smith, J., Gutstein, E., & Dallacqua, L. (2012). *Examining CPS' plan to close, turn-around, or phase-out 17 schools*. Collaborative for Equity and Justice in Education, College of Education, Univeristy of Illinois - Chicago & Nathalie P. Voorhees Center for Neighborhood and Community Improvement, College of Urban Planning and Public Affairs, University of Illinois - Chicago.

[15]     *Id.*

[16]     *Id.*

[17]     *Id.*

100.    The United States Department of Education declined to endorse the study because of concerns regarding the methodologies used by the researchers.[18]

101.    The CCSR study did not endorse turnarounds as an effective model for improving student performance.

102.    As reported by *News Tips* in May, 2013, at the same time as defendant approved 5 more schools for AUSL, the AUSL performance was abysmal.  Of the 12 schools turned around and turned over to AUSL between 2006-2010, ten schools were on academic probation in May 2013.  Only one of those schools was rated as a high performing Level 1 school and 11 were *below* the CPS district-wide average for the ISAT composite test scores.  See: http://www.newstips.org/2013/05/ausl-turnarounds-called-ineffective-expensive

## STATEMENT OF THE CLAIM

### A.  Defendant's Turnaround Practice has a Discriminatory Racial Impact

103.    Defendant's turnaround practice and policies negatively impact African American teachers and staff.

104.    Racial disparities in CPS system are severe. African American teachers and staff are far more likely to teach in schools targeted for turnaround than whites.  While African Americans make up approximately 28% of the tenured teachers in all of CPS, they account for approximately 35% of tenured teachers in South and West side schools, as compared to only 9.25% of tenured teachers in North side schools.  African American tenured teachers account for approximately 51.1% of the tenured teachers terminated as a result of turnarounds.

----

[18]    *Id.*

-23-

105.    Defendant Board employs approximately 23,000 teachers, over 16,500 of whom are tenured.

106.    Approximately 47% of all tenured teachers employed by the Board are Caucasian.

107.    Approximately 29% of all tenured teachers employed by the Board are African-American.

108.    Approximately 24% of all tenured teachers employed by the Board are non-African American minorities.

109.    177 (51.1%) of the 347 tenured teachers terminated as a result of defendant's turnarounds approved on February 22, 2012 were African American.

110.    Less than half of all tenured teachers are re-hired after a school is subjected to turnaround, and the teaching populations of schools subjected to turnaround are historically younger and more white.[19]

### B. The Selection of Turnaround Schools and Teachers for Termination is Neither Job-Related nor Consistent with Business Necessity

111.    Defendant's turnaround practices and policies are utilized exclusively in neighborhoods with higher minority student populations and have resulted in the wholesale termination of all employees at the school, and without any individualized assessment of the performance of the teachers.

112.    Defendant has not promulgated any turnaround policies since 2012.

---

[19]    de la Torre, M., Allesworth, E., Jagesic, S., Sebastian, J., Salmonowicz, M., Meyers, C. & Gerdeman, R.D. (2012). *Turning Around Low-Performing Schools in Chicago*. University of Chicago Consortium on Chicago School Research & American Institutes for Research.

113.    South and West side schools have been subjected to a revolving door of criteria upon which schools are selected for turnaround. In 2012 - 2014, the schools were given no formal indication of the basis upon which their schools were chosen as opposed to others.  The inability of schools to predict whether they will be selected for turnaround makes it difficult to assess the best strategies for improvement.

114.    Individual teachers who perform well despite the conditions of the school, are terminated without consideration of their performance.

115.    Schools selected for turnaround in 2012-14 were not the poorest performing schools.  Schools in the North side of the city, with higher percentage Caucasian teachers, performed worse than schools selected for turnaround in several of the selection categories.

116.    Defendants selected schools for turnaround based on their geographic location, and further indicate a pattern of schools in specific geographic locations being entrusted to AUSL[20].

117.    AUSL fails to hire African American teachers at the rates at which they are terminated, despite being equally qualified for positions within the school.  The Board thus unnecessarily excludes qualified teachers, and undermines its own publicized goal of achieving excellence and diversity in public education.

**1.  Defendant's turnaround selection process is ambiguous and discriminatory**

118.    While CPS for many years published some criteria for eligible schools, the actual selection process is not transparent. No objective performance metric can be used

---

[20]        See attached Exhibit B, a map of schools subjected to turnaround based on the operator of the school.

or relied upon by teaching staff or the public to predict with any degree of consistency which schools will be selected by CPS and the Board for turnaround.

119. P.A. 96-0803 established the Chicago Educational Facilities Task Force ("CEFTF"), charged with ensuring that school facility-related decisions are made with the input of the community and reflect educationally sound and fiscally responsible criteria.

120. In response to the turnarounds announced on November 30, 2011, the CEFTF stated the guidelines used to select schools for turnarounds, and other school action, were too vague and not transparent enough to satisfy state law requirements.

121. In January 2012, CEFTF publically called for a moratorium on the turnarounds, and other school actions, stating "CPS's historic and continuing lack of transparency and evidence-based criteria for decisions resulted in the pervasive climate of public suspicion about what drives CPS to take schools actions and allocate resources, often in ways perceived to be highly inequitable."

### 2. Schools selected for turnaround are not the poorest performing

122. At Carter G. Woodson South, 19 of the 23 tenured teachers terminated in 2012 as a result of Defendant's decision to turnaround the school, or roughly 82.6%, were African American.

123. Woodson received 19.0% of the possible 42 Performance Points.

124. 50.3% of Woodson's students received a "meets" or "exceeds" composite score on the ISAT.

125. Woodson ranked in the 7th percentile in trend and growth statistics.

126. Woodson had been on Level 3 probation in 2009-2010 and 2010-2011.

127.    The following schools received a lower percentage of total Performance Points than Carter, and were not selected for turnaround, or other school action in 2012:

| CPS School | Percentage of Total Performance Points Received |
|---|---|
| George Washington Carver Elementary School | 16.7% |
| Betsy Ross Elementary School | 16.7% |
| Enrico Fermi Elementary School | 14.3% |
| Emmett Louis Till Math and Science Academy | 14.3% |
| Rosewell B. Mason Elementary School | 14.3% |
| Charles Kozminski Elementary Community Academy | 11.9% |
| Dewey Elementary Academy of Fine Arts | 9.5% |
| Robert H. Lawrence Elementary School | 9.5% |
| Lawndale Elementary Community Academy | 9.5% |

128.    The following schools received a lower 2011 ISAT Meets/Exceeds percentage and were not selected for turnaround in 2012, or other school action in 2012:

| CPS School | Percentage of Students Meeting or Exceeding State Composite ISAT Standards |
|---|---|
| Simon Guggenheim Elementary School | 40% |
| Betsy Ross Elementary School | 43.5% |
| Dewey Elementary Academy of Fine Arts | 44.4% |

| | |
|---|---|
| Robert H. Lawrence Elementary School | 47.1% |
| Enrico Fermi Elementary School | 47.8% |
| Lawndale Elementary Community Academy | 48.4% |
| James R. Doolittle Jr. Elementary School | 49% |
| Julia C. Lathrop Elementary School | 49.6% |
| Oliver Wendell Holmes Elementary School | 49.7% |
| Emmett Louis Till Math and Science Academy | 49.9% |

129.    The following schools were ranked lower in trend and growth statistics than the 2012 turnaround schools:

| CPS School | Trend and Growth Statistic Percentile |
|---|---|
| Charles Kozminski Elementary Community Academy | 0 Percentile |
| Robert H. Lawrence Elementary School | 1st Percentile |
| Roswell B. Mason Elementary School | 1st Percentile |
| Lawndale Elementary Community Academy | 1st Percentile |
| Foster Park Elementary School | 1st Percentile |
| John Fiske Elementary School | 1st Percentile |
| George Washington Carver Primary School | 1st Percentile |
| Dewey Elementary Academy of Fine Arts | 2nd Percentile |

| | |
|---|---|
| James N. Thorp Elementary School | 2nd Percentile |
| Countee Cullen Elementary School | 2nd Percentile |
| Frederick Funston Elementary School | 4th Percentile |
| Enrico Fermi Elementary School | 4th Percentile |
| Thomas A. Hendricks Elementary School | 4th Percentile |
| John Marshall Metropolitan High School | 4th Percentile |
| Emmett Louis Till Math and Science Academy | 5th Percentile |
| Harriet Beecher Stowe Elementary School | 5th Percentile |
| George Manierre Elementary School | 5th Percentile |

130. In 2012, the following schools ranked lower than Woodson in percentage of Performance Points, ISAT composite and rank in trend and growth statistics: Fermi, Till, Dewey and Lawndale.

131. In 2012, three of the four schools ranked lower overall than Carter employed a lower percentage of African American tenured teachers than Carter: Fermi (30%), Till (7%) and Lawndale (46%).

132. In 2012, in particular, Till Elementary School employed 7% African American tenured teachers compared to 61% Caucasian teachers, and was not subject to turnaround or any other school action.

133. Till employs a lower percentage of African American tenured teachers than any of the elementary schools selected for turnaround in 2012.

134.    At Chicago Vocational, 48 of the 72 tenured teachers terminated as a result of the Defendants BOE's decision to turnaround the school, or roughly 66.6%, were African American.

135.    Chicago Vocational received 26.2% of a possible 42 Performance Points during the 2010-2011 school year.

136.    Chicago Vocational maintained a graduation rate of 49.5% during the 2010-2011 school year.

137.    Chicago Vocational was in the 21st percentile in trend and growth statistics.

138.    The following schools received the same or lower percentage of total Performance Points than Chicago Vocational, and were not selected for turnaround, or other school action: Kelvyn Park High School (23.8%) and Christian Fenger Academy High School (26.2%).

139.    The following schools had a lower Graduation rate:

| CPS School | 2010-2011 Graduation Rate |
|---|---|
| Christian Fenger Academy High School | 34.8% |
| Emil G. Hirsch Metropolitan High School | 36.2% |
| High School of Leadership at South Shore | 36.6% |
| John Marshall Metropolitan High School | 36.8% |
| William Rainey Harper High School | 37% |
| Roger C. Sullivan High School | 39.3% |
| Nicholas Senn High School | 40.1% |
| Paul Robeson High School | 40.6% |
| George H. Corliss High School | 42.8% |

| David G. Farragut Career Academy High School | 43.2% |
|---|---|
| John M. Harlan Community Academy High School | 47.9% |
| Manley Career Academy High School | 49% |

140.    The following schools were ranked the same or lower in trend and growth statistics than the 2012 turnaround schools: Kelvyn Park (11%) and Fenger (21%).

141.    Both Kelvyn Park and Fenger rank the same or lower than Chicago Vocational in a comparison of percentage Performance Points accumulated, graduation rate and rank in trend and growth statistics.

142.    Fenger is an AUSL-operated school subjected to turnaround in 2009.  As of November 29, 2011, it was performing no better than Chicago Vocational despite having received several millions dollars in additional funds and capital investments to renovate the building, funds denied to Chicago Vocational. Fenger employs 58% African American tenured teachers compared to 27% Caucasian teachers. It was not subject to turnaround or any other school action in 2012.

143.    Kelvyn Park is located in the North-Northwest High School network and employs 3% African American tenured teachers compared to 61% Caucasian teachers, and was not subject to turnaround or any other school action in 2012.

144.    At Tilden,18 out of 33 tenured teachers terminated as a result of the Defendant's 2012 turnaround, or roughly 54.5%, were African American.

145.    Tilden, like Chalmers in 2013,  is unique insofar as it had moved from Level 3 probationary status during the 2009-2010 school year, to level 2 non-probationary status during the 2010-2011 school year.

146. During the 2010-2011 school year, Tilden received 46.8% of a possible 42 Performance Points.

147. Tilden maintained a graduation rate in 2010-2011 of 41%.

148. Tilden ranked in the 79th percentile in trend and growth statistics.

149. 22 high schools had at least two consecutive years on probation as of November 29, 2012, yet were not selected for turnaround or other school action.

150. Including Kelvyn Park, eight (8) of the 22 schools which had been on probation for two consecutive years but were not selected for turnaround, or other school action, were located in the North-Northwest High School network: Kelvyn Park, Sullivan, Amundsen, Roosevelt, Foreman, Schurz, Steinmetz and Senn.

151. In 2012, each of the above eight (8) high schools located in the North-Northwest High School network earned a lower percentage of Performance Points than Tilden: Kelvyn Park (23.8%), Sullivan (35.7%), Amundsun (38.9%), Roosevelt (39.7%), Foreman (39.7%), Schurz (39.7%), Steinmetz (40.5%) and Senn (42.9%).

152. In addition to the above eight (8) high schools located in the North-Northwest High School network, at least 14 others not subjected to school action or turnaround also received a lower percentage of Performance Points than Tilden in 2012.

153. In 2012, each of the above eight (8) high schools located in the North-Northwest High School network ranked lower in percentile trend and growth statistics than Tilden: Kelvyn Park (11th percentile), Sullivan (45th percentile), Amundsun (37th percentile), Roosevelt (55th percentile), Foreman (55th percentile), Schurz (55th percentile), Steinmetz (45th percentile) and Senn (63rd percentile).

154.    In addition to the above eight (8) high schools located in the North-Northwest High School network at least 14 others not subjected to school action or turnaround in 2012 also ranked lower in percentile trend and growth statistics than Tilden.

155.    Two (2) of the above eight (8) high schools located in the North-Northwest High School network maintained a lower graduation rate than Tilden during the 2010-2011 school year: Sullivan (39.3%) and Senn (40.1%).

156.    In addition to the above two (2) high schools located in the North-Northwest High School network, at least 10 others not subjected to school action or turnaround also maintained a lower graduation rate during the 2010-2011 school years than Tilden.

157.    Sullivan is located in the North-Northwest High School network and employs 15% African American tenured teachers, compared to 67% Caucasian tenured teachers, and was not subject to turnaround or any other school action in 2012.

158.    Senn is located in the North-Northwest High School network and employs 14% African American tenured teachers compared to 69% Caucasian tenured teachers, and was not subject to turnaround or any other school action in 2012.

159.    In selecting the 10 schools for turnaround in 2012, as referenced in ¶74 above, Defendants targeted schools with large African American student, staff and teaching populations, resulting in the termination of a disproportionate number of African American tenured teachers and staff.

### 3. Schools selected for turnaround are exclusively located in the South and West regions of the city

160. Of the roughly 4500 African American tenured classroom teachers employed by CPS, about 90% are employed in the Far South, South Side, Southwest Side and West Side high school networks or their corresponding elementary schools.

161. 34 schools have been subjected to turnaround since 2006.

162. Each of the 34 school turnarounds occurred in the Far South, South Side, Southwest Side and West Side high school or elementary networks.

163. No schools from the North-Northwest High School network or its corresponding elementary schools have ever been selected for turnaround, or any other school action.

164. As of November 29, 2012, at least 12 elementary schools and eight high schools met the historical turnaround criteria, yet none were selected.

165. By December 2012, defendant intended to close or turnaround another 95 schools"most on the West and South sides" by 2019. Defendant intended to reward the friends of Vitale and others in power, including AUSL, with the spoils - another school.

166. Defendant's policy and practice of targetting the South and West sides of the city for turnaround, discriminates against and disproportionately impacts African American tenured teachers and staff.

### 4. Turnarounds do not achieve better student performance

167. CPS maintains approximately 200 elementary schools with a student population of 95% or more low-income students. Each of these schools is located in the South and West sides of the City targeted for turnaround.

168. Twelve of the low-income elementary schools are "turnaround" schools.

169.    During the 2010-2011 school year, the year immediately preceding the most recent turnaround selections, only 33 of the roughly 200 low-income elementary schools were above the City-wide average of 69.5% for students who meet or exceed state standards on the ISAT reading test.[21/]

170.    Each of the 33 high-poverty elementary schools that were above the City-wide average were neighborhood schools operated by Local School Councils, community and teachers.

171.    None of the 12 elementary schools previously subjected to turnaround were above the City-wide average for students that meet or exceed state standards on the ISAT reading test.

172.    In particular, Sherman Elementary school, operated by privately owned AUSL for 5 years, ranked 171 among all low-income elementary schools with 52.2% of its students meeting or exceeding state standards on the ISAT reading test roughly 17 points lower than the City-wide average.

173.    The highest ranked turnaround elementary school ranked 53rd among all high-poverty elementary schools with 67% of its students meeting or exceeding state standards on the ISAT reading test, or, 2 points below the City-wide average.

---

[21/]    *Chicago's Democratically-led Elementary Schools Far Out-Perform Chicago's "Turnaround Schools."* Designs for Change. (2012).

174.    The 33 schools exceeding the city-wide average are located in the same neighborhoods as each of the 12 schools subjected to turnaround, which failed to exceed city-wide averages[22].

175.    As of November 29, 2011, the following seven (7) schools that were subjected to turnaround between 2004 and 2011 were designated as performing at a "Level 3". Thus, the school was identified as on probation and in danger of being re-subjected to school action, potentially including turnaround: Sherman Elementary School, Fenger High School, Bethune Elementary School, Curtis Elementary School, Bradwell Elementary School, Phillips High School and Marshall High School.

176.    Sherman, Bethune, Curtis, Bradwell and Phillips are all operated by AUSL, while Fenger and John Marshall are operated by CPS's OSI.

### 4. Turnarounds result in high teacher turnover which ultimately results in declining student performance

177.    From 2008 to 2011, 58% of teachers employed in turnaround schools were no longer teaching at the school three years later.

178.    In comparison, from 2008 to 2011 only 29% of teachers employed in non-turnaround schools, or 50% less than the statistics for turnaround schools, were no longer teaching at the school three years later.

---

[22]    See attached Exhibit D, a map showing the 33 low-income schools exceeding city-wide averages in ISAT reading as well as the location of each turnaround elementary school, all of which fell below the city-wide average. *Chicago's Democratically-led Elementary Schools Far Out-Perform Chicago's "Turnaround Schools."* Designs for Change, pg. 12 (2012).

179.    Specifically, Morton School of Excellence, Robert Fulton Elementary School and Anna R. Langford Community Academy each had a teacher turnover rate of over 70% from 2008 to 2011.

180.    High teacher turnover from year-to-year contributes to a decline in student performance.

181.    In Urban school districts like CPS, high teacher turnover also undermines social supports for low-income students, a large percentage of whom grow-up in single family homes or are homeless.

**5.  Turnarounds are costly and require divestment from neighborhood schools**

182.    CPS's operating budget is approximately $5 billion annually.

183.    The Board set aside $20 million for schools being subjected to turnaround in the 2012-2013 budget.

184.    Historically, elementary schools subjected to turnaround and entrusted to AUSL received roughly $7 million dollars in extra funding over the course of each five-year contract, which include a one-time fee paid to AUSL of roughly $300,000, an annual per-pupil-fee of $420 for elementary school students, an average of $1 million per year in capital investments, additional staff in the first year and the costs of teacher and administration pre-preparation programs.

185.    Defendant's COO Tim Cawley has also described additional funds to support "a new gifted program or a language program."

186.    Additionally, CPS is responsible for the costs of replacing teachers in schools with high teacher turnover.

187.    In comparison, South and West schools not subjected to turnaround are not specifically granted any per-pupil funds.

188.    From 2008 through 2011, the 10 schools selected for turnaround in February 2012 received the following Capital Investments from defendants:

| SCHOOL | 2009 | 2010 | 2011 |
|---|---|---|---|
| Fuller School | $ 0 | $ 0 | $ 0 |
| Smith School | $ 105,754 | $ 0 | $ 0 |
| Herzl School | $ 0 | $ 0 | $ 0 |
| Casals School | $ 0 | $ 0 | $ 0 |
| Marquette School | $ 0 | $ 0 | $ 20,000 |
| Piccolo Elementary School | $ 0 | $ 0 | $ 0 |
| Stagg School | $ 0 | $ 0 | $ 0 |
| Woodson South School | $ 0 | $ 0 | $ 0 |
| Chicago Vocational High School | $ 43,210 | $ 80,939 | $ 0 |
| Tilden Academy | $ 29,500 | $ 33,920,000 | $ 0 |

## C. Defendants Fail to Implement Less Discriminatory Alternatives to Turnaround that Would Better Achieve the Board's Legitimate Educational Interests

189.    Defendant's turnaround policies and practices result in the disproportionate termination of qualified African American tenured teachers and staff.

190.    No legitimate rationale exists to permit defendants to continue subjecting schools to turnaround and the termination of qualified tenured teachers and staff.

191.    Less discriminatory alternatives to turnarounds and the Board's turnaround practices and policies include but are not limited to the following steps:

(1)    An immediate moratorium on all turnarounds;

(2)    Assessment and implementation of alternatives set forth in the School Code and herein;

(3)    Implementation of published rules and criteria to restore turned around schools back to CPS and away from privately owned operators;

-38-

(4)     To the extent not followed by defendant, inclusion of turnarounds as a "school action" and publication of the specific criteria used to select the pool of eligible schools for turnaround and the specific schools chosen;

(5)     Investment of resources in schools being considered for turnaround, *prior to* selection for turnaround;

(6)     A process to guarantee of employment for all qualified tenured teachers and staff, either at the same school or a different school within CPS.

(7)     A statistical and adverse impact analysis on the basis of race, of all proposed turnarounds and school actions, and

(8)     The appointment of an independent monitor who does not report to defendants, to oversee all turnaround actions, processes and practices.

## CLASS ACTION ALLEGATIONS

192.    Plaintiffs are members of the Class, which includes all African American tenured teachers and para-professionals employed by the Board from the 2011-2012 school year through the present, and continuing in the future, at any schools subjected to turnaround and who were displaced as a result of the Board's turnaround practice, or who may be subjected to the Board's policies or practices in the future.

193.    The members of the Class are so numerous that joinder of all of them is impracticable.  Roughly 347 tenured teachers, in addition to para-professionals and other staff were terminated as a result of the 2012 turnaround and 127 in 2013 of which 177 of these teachers in 2012 were African American.

194.    There are questions of law and fact common to the Class, and these questions predominate over any questions affecting only individual members.  Common questions include, without limitation:

(1)     Whether it is Defendant's policy or practice to target schools in specific geographic regions for turnaround,

(2)    Whether Defendant's policy or practice to select schools for turnaround in specific geographic regions has a disparate impact on the employment of African American tenured teachers,

(3)    Whether Defendant's policy or practice to select schools for turnaround in specific geographic regions is job related and consistent with business necessity,

(4)    Whether less discriminatory policies exist that would meet Defendant's legitimate business needs; and

(5)    What equitable, declaratory and injunctive relief is warranted.

195.    Plaintiffs' claims are typical of the claims of the Class: (1) Each of the Plaintiffs was employed at a school selected for turnaround by the Board on or after 2012; (2) Each was terminated from his or her position as a tenured teacher or staff; (3) Each was sent substantially the same form letter notifying them of their rights upon displacement; (4) Each has the same discrimination claims based on disparate treatment and disparate impact. All of these claims are shared by each and every class member.

196.    Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class.

197.    Plaintiffs have retained counsel competent and experienced in complex class actions and employment discrimination litigation.

198.    Class Certification is appropriate under each count of this Complaint pursuant to Fed. R. Civ. P. 23(b)(2) and (b)(3) because Defendants has acted and/or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the Class as a whole. The Class members are entitled to declaratory and injunctive relief to end Defendant's discriminatory policies and/or practices.

**COUNT I**
**Title VII - Racial Discrimination - Disparate Treatment**

199.    Plaintiffs restate and reallege paragraphs 1-198as if fully set forth herein.

200.    Defendants intentionally subjected Plaintiffs and the class of similarly situated employees who were terminated from 2011 through the present, to unequal and discriminatory treatment  and denying them the right to re-apply or be reinstated because of their race.

201.    Defendant's actions were willful and in violation of Title VII.

202.    Defendant's actions in intentionally discriminating against Plaintiffs, have caused Plaintiffs lost wages and benefits, pecuniary losses, and other consequential damages.

203.    The named Plaintiffs and members of the Title VII Class have been equally affected by the violations of Defendant's decisions, policy or plan to turnaround plaintiffs' schools and terminate the tenured teachers and staff.

204.    Upon information and belief, African American tenured teachers and staff were singled out for termination from their positions at each of the schools subjected to "turnaround" in 2011 and continuing through the present, and replaced by teachers and staff who, as a body, are made up of fewer African American tenured teachers and staff.

205.    Upon information and belief, Defendants have terminated a class at least 174 additional similarly situated teachers as a result of Defendant's common unlawful employment practices during the respective Class Period.

**WHEREFORE,** Plaintiffs pray this court enter judgment on their behalf and against Defendants for damages including, but not limited to:

A. Certification of the case as a class action on behalf of the proposed Class;
B. Declare that the acts and conduct of defendants violate Title VII;
C. The appointment of a monitor to evaluate and oversee the turnaround process;
D. Order a moratorium on turnarounds and implementation of less discriminatory alternatives;
E. An order reinstating Plaintiffs and Class members to their positions or substantially equivalent positions, or in lieu of reinstatement, front pay and benefits;
F. To be made whole for the damages and financial losses suffered;
H. Attorneys' fees and all costs and expenses of suit pursuant to 42 U.S.C. §1981a and 1988; and
I. Such other and further relief as this Court deems appropriate and just.

## COUNT II
### Title VII - Racial Discrimination - Disparate Impact

206.    Plaintiffs restate and reallege paragraphs 1- 205 as if fully set forth herein.

207.    Defendant's policy and practice of targeting South and West side schools for turnaround resulting in the termination of all teachers and staff employed at selected schools has a disparate impact on African Americans. Defendant's policy and practice and is neither job related nor consistent with business necessity.  Additionally, less discriminatory alternatives exist that would equally serve any legitimate purpose.

208.    Plaintiffs and the Class have no plain, adequate, or complete remedy at law to redress the wrongs alleged herein, absent the declaratory and injunctive relief sought in this action.

209.    Defendant's conduct has caused, and continues to cause, Plaintiffs and the members of the Class substantial losses in earnings and other employment benefits.

**WHEREFORE,** Plaintiffs pray this court enter judgment on their behalf and against Defendants for damages including, but not limited to:

A. Certification of the case as a class action on behalf of the proposed Class;
B. Declare that the acts and conduct of defendants violate Title VII;
C. The appointment of a monitor to evaluate and oversee the turnaround process;

D. Order a moratorium on turnarounds and implementation of less discriminatory alternatives;

E. An order reinstating Plaintiffs and Class members to their positions or substantially equivalent positions, or in lieu of reinstatement, front pay and benefits;

F. To be made whole for the damages and financial losses suffered;

H. Attorneys' fees and all costs and expenses of suit pursuant to 42 U.S.C. §1981a and 1988; and

I. Such other and further relief as this Court deems appropriate and just.

## COUNT III - 42 U.S.C. §1981 - RACIAL DISCRIMINATION

210.    Plaintiffs restate and reallege paragraphs 1- 209 as if fully set forth herein.

211.    42 U.S.C. Section 1981, as amended, guarantees all persons the same righ tot make and enforce contracts as non African Americans. The term "make and enforce" contracts includes the making, performance, modification and termination of contracts and the enjoyment of all benefits, privileges, terms and conditions of contractual relationship.

212.    Defendants subjected Plaintiffs and all others similarly situated to racial discrimination in violation of 42 U.S.C. §1981.

**WHEREFORE,** Plaintiffs pray this court enter judgment on their behalf and against Defendants for damages including, but not limited to:

A. Certification of the case as a class action on behalf of the proposed Class;

B. Declare that the acts and conduct of defendants violate Section 1981;

C. The appointment of a monitor to evaluate and oversee the turnaround process;

D. Ordering moratorium on turnarounds and implementation of less discriminatory alternatives;

E. An order reinstating Plaintiffs and Class members to their positions or substantially equivalent positions, or in lieu of reinstatement, front pay and benefits;

F. To be made whole for the damages and financial losses suffered;

H. Attorneys' fees and all costs and expenses of suit pursuant to 42 U.S.C. §1981a and 1988; and

I. Such other and further relief as this Court deems appropriate and just.

## COUNT IV - 42 U.S.C. §1983-DEPRIVATION OF EQUAL PROTECTION

213.    Plaintiffs incorporates paragraphs 1 through 212 as if set forth herein.

214.    Plaintiff CTU, as the exclusive representative of teachers in Chicago public schools, as well as the individual plaintiffs are entitled to assert the individual constitutional and statutory rights of such teachers with respect to their employment for the purpose of declaratory and injunctive relief.

215.    At all times relevant. Defendant was acting under color of state law.

216.    Defendant's discriminatory actions were taken pursuant to Board and CPS custom, policy or practice and pattern and practice.

217.    The actions set forth above, in implementing its turnaround policies and practices, the Board has acted under color of law to deprive tenured teachers and staff of their rights to equal employment under the equal protection clause of Fourteenth Amendment in violation of 42 U.S.C. § 1983.

218.    By depriving plaintiffs of their rights to equal protection and treating non African-American staff differently, defendants have deliberately and intentionally violated Plaintiff's rights guaranteed by the Fourteenth Amendment to the Constitution of the United States.

219.    Plaintiffs and the class have suffered damages as a result of Defendant's discriminatory actions, including but not limited to loss of their jobs, earnings and benefits.

220.    Defendants will continue such unlawful deprivation of equal rights in future unless and until restrained by this Court.

-44-

**WHEREFORE,** Plaintiffs pray this court enter judgment on their behalf and against Defendants for damages including, but not limited to:

A. Certification of the case as a class action on behalf of the proposed Class;
B. Declare that the acts and conduct of defendants violate Section 1983;
C. The appointment of a monitor to evaluate and oversee the turnaround process;
D. Order a moratorium on turnarounds and implementation of less discriminatory alternatives;
E. An order reinstating Plaintiffs and Class members to their positions or substantially equivalent positions, or in lieu of reinstatement, front pay and benefits;
F. To be made whole for the damages and financial losses suffered;
H. Attorneys' fees and all costs and expenses of suit pursuant to 42 U.S.C. §1981a and 1988; and
I. Such other and further relief as this Court deems appropriate and just.

**Jury Demand**

Plaintiffs hereby respectfully demand a jury trial.

Respectfully submitted,

/s/ Robin Potter
One of Plaintiffs' Attorneys

Robin Potter, Esq. ARDC # 3123932
ROBIN POTTER & ASSOCIATES, P.C.
111 E. Wacker Dr., Suite 2600
Chicago, IL 60601
(312) 861-1800
robin@potterlaw.org