## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

CHICAGO TEACHERS UNION, LOCAL 1,   )
AMERICAN FEDERATION OF TEACHERS,   )
AFL-CIO; DONALD L. GARRETT JR.;   )
ROBERT GREEN; and VIVONELL BROWN,   )
JR., individually and on behalf of all similarly   )
situated persons,   )
  )
        Plaintiffs,   )
  )      No. 12 C 10311 & 15 C 8149
    v.   )
  )      Judge Sara L. Ellis
BOARD OF EDUCATION OF THE CITY   )
OF CHICAGO, a body politic and corporate,   )
  )
        Defendant.   )

## OPINION AND ORDER

On February 22, 2012, the Board of Education of the City of Chicago (the "Board")

announced that ten Chicago Public Schools ("CPS") schools would be "turned around" or

"reconstituted," a process that involves replacing all teachers and staff at those schools.

Plaintiffs Donald J. Garrett Jr., Robert Green, and Vivonell Brown, Jr., three African American

tenured teachers affected by the turnarounds, and the Chicago Teachers Union, Local 1 ("CTU")

filed suit against the Board, alleging that the Board's decision to turn around these ten schools

was racially discriminatory. The Court certified the following class: "All African American

persons employed by the Board of Education of the City of Chicago as a teacher or para-

professional staff, as defined in the labor agreement between the Chicago Teachers Union and

the Board of Education, in any school or attendance center subjected to reconstitution, or

'turnaround,' in the 2012 calendar year." Doc. 173. After the Board turned around additional

schools in 2013 and 2014, CTU filed a related case against the Board, which the Court

consolidated with the class action challenging the 2012 turnarounds. The parties have now filed cross-motions for summary judgment. Because material questions of fact exist with respect to all of Plaintiffs' claims, the Court denies the parties' cross-motions for summary judgment.

**BACKGROUND**[1]

## I.      The Turnaround Process

The Board serves as the governing body of CPS. Between 2011 and 2014, it oversaw 600 elementary and high schools and over 400,000 students. CPS is divided into five collaborative areas (North/Northwest, West, Southwest, South, and Far South) and further into geographic networks. A network chief supervises the schools in each network.

The Illinois School Code, 105 Ill. Comp. Stat. 5/34-8.3(d), provides that schools may be subject to turnaround if they have been on probation for at least one year and have failed to make adequate progress in correcting deficiencies. In a turnaround, the Board removes all staff, except engineers and lunchroom workers, from their positions without a promise of another position within CPS. The mass displacement does not take into account teacher ratings or years of service. Displaced employees have to apply for open positions if they want to continue working for the Board. After a turnaround, the Board typically contracts with a third party, such as the Academy for Urban School Leadership ("AUSL"), to run the school. Although the CPS CEO

---

[1] The Court derives the facts in this section from the Joint Statement of Undisputed Material Facts and accompanying exhibits. The Court takes all facts in the light most favorable to the non-movant, i.e. the Board when considering Plaintiffs' motion and Plaintiffs when considering the Board's motion. The Court addressed the parties' objections to the other side's experts in detail in the Court's February 25, 2020 Opinion and Order, concluding that, with certain limited exceptions, their objections go to the weight, not admissibility, of the expert opinions. Doc. 289.

makes the decision as to which schools to recommend for turnaround to the Board, the Board has the final say.[2] CTU plays no decisionmaking role in the turnaround process.

The Board maintains that it chose schools for turnaround because they performed poorly as a unit for several years and showed no signs of academic improvement. Oliver Sicat, head of CPS' portfolio office during the relevant time period, described a turnaround as a "last resort" to save an underperforming school. Doc. 297 ¶ 20. With turnaround schools starting over with a clean slate, the Board hoped to eliminate any existing culture of complacency among students and staff.

Between 2006 and 2014, the Board turned around thirty-four CPS schools. It also closed forty-nine schools in 2013. As relevant here, the Board turned around ten schools in 2012, five schools in 2013, and three schools in 2014. After a turnaround, the affected school receives additional resources not only from the Board but also from the turnaround operator. The Board entered into management contracts with AUSL for six turnaround schools in 2012 and all of the turnaround schools in 2013 and 2014. Each AUSL management contract, which has a five-year term, had a value of $300,000 per year plus $420 per pupil per year.

CTU represents over 30,000 professional educators and CPS employees and is the exclusive bargaining representative for all CPS teachers and paraprofessionals ("PSRPs"). Pursuant to the 2007-2012 collective bargaining agreement between the Board and CTU, affected tenured teachers after the 2012 turnarounds were placed in a reassigned teacher pool where they continued to receive a full salary and benefits for one school year (i.e. ten months). Under the 2012-2015 collective bargaining agreement, affected tenured teachers after the 2013 and 2014 turnarounds were placed in a reassigned teacher pool and received full pay and benefits

---

[2] As relevant here, Jean-Claude Brizard served as the CPS CEO from April 2011 to October 2012 and Barbara Byrd-Bennett served as the CPS CEO from October 2012 to June 2015.

for five months.  Probationary teachers and paraprofessionals ("PSRPs") were not placed in the reassigned teacher pool and did not receive a salary or benefits after September 1, 2012.

## II.    CPS Measures of Academic Performance

Beginning in 2008, the Board used the Academic Performance Policy ("APP") to monitor the performance of schools within CPS.  With some variation between elementary and high schools, the APP awarded schools points based on performance on the Illinois Standard Achievement Test ("ISAT"), the trend over time on ISAT scores, attendance, and a value-added score.  The value-added score measured a school's academic progress and compared its improvement over time to other schools in the same geographic network, controlling for students' demographics.  The Board used school-level value-added scores at 15% of its elementary schools but did not have a value-added score for high schools.  For high schools, the APP points calculation also took into account the dropout rate, the freshmen on track rate, and success in advanced placement programs.  The APP then used a school's percentage of points to categorize the school as Level 1, 2, or 3.  The Board categorized elementary schools with less than 50% of possible points and high schools with less than 44% of possible points as Level 3, or the lowest academic level, and placed them on probation.

In August 2013, the Board adopted the School Quality Rating Policy ("SQRP") to replace the APP for the 2014-2015 school year, using data gathered in the 2013-2014 school year.  The SQRP included five status levels instead of the APP's three.  To formulate a performance score, the SQRP replaced ISAT test scores with the Northwest Evaluation Association Measure of Academic Progress Assessment ("NWEA-MAP") or ACT assessment attainment and growth test scores in reading and math.  It also considered the results of the My Voice My School 5

Essentials Survey ("5 Essentials Survey")[3] and attendance, freshman on track, graduation, dropout, and college enrollment rates.

In the 2011-2012 school year, 404,151 students attended CPS schools, with 30.4% attending Level 3 schools that had been on probation for a year or more. In the 2012-2013 school year, 403,461 students attended CPS schools, with 32.5% attending Level 3 schools. In the 2013-2014 school year, 400,545 students attended CPS schools, with 30.3% attending Level 3 schools.

## III.    The 2012 Turnarounds

In fall 2011, the Board began considering schools for turnaround in 2012. The 2012 turnaround process started first by identifying approximately 250 schools that had been on probation for at least one year. The Board then narrowed the list to 226 schools, excluding all non-Level 3 schools except for Tilden High School, a Level 2 school that had been on probation for eight consecutive years and fifteen of the last sixteen years. At the next step, the Board removed schools with composite ISAT scores above the network average for elementary schools or a five-year graduation rate above the network average for high schools, as well as schools that had achieved the twenty-fifth percentile or higher on the APP's growth components. This step left seventy-four schools on the list. A qualitative process followed, which involved soliciting input from network chiefs and representatives from other Board departments to address transportation, facilities, safety, and special education needs. Sicat testified that the turnaround selection process "was much more nuanced than just rank[ ] ordering one part of the [APP],"

---

[3] The 5 Essentials Survey was an annual survey administered to teachers and students by the Consortium on Chicago School Research ("CCSR") at the University of Chicago. It addressed the following five areas: ambitious instruction, collaborative teachers, effective leaders, involved families, and a supportive environment.

with the Board also considering community dynamics, academic performance, improvement over time, and the success of prior support measures.  Doc. 297 ¶ 40.

Ultimately, on November 30, 2011, the CPS CEO recommended ten schools for turnaround.  The elementary schools recommended for turnaround were Casals, Fuller, Herzl, Marquette, Piccolo, Smith, Stagg, and Woodson.  The high schools recommended for turnaround were Tilden and Chicago Vocational Career Academy ("CVCA").  These ten schools, except for Tilden, were Level 3 schools that had been on probation for at least four years.  They all performed below their geographic network average and the district average on the APP metrics.  But almost every school proposed for turnaround in 2012 had seen small improvements in the years leading up to the turnaround.  For example, Tilden had previously been eligible for turnaround in 2009, having only 8.3% APP points the previous year.  For the 2011-2012 school year, Tilden's APP points had increased to 46.8%.

The Board conducted public hearings for each of the proposed turnaround schools in January and February 2012.  At each hearing, the hearing officer heard testimony from the respective network chief, a CPS data analyst, a representative of the proposed post-turnaround operator, and members of the public, including representatives of the local school councils, CTU, teachers, parents, students, and public officials.  Denise Little, the Garfield Humboldt network chief in 2012, testified that Casals suffered in part because the staff did not have high expectations for Casals students.  She also stated that staff at both Casals and Piccolo did not believe in their students and locked the schools up at 3 p.m.  Harrison Peters, the interim Lake Calumet network chief in 2011 and 2012, testified that the parents of Smith students wanted a change.  Although CTU representatives spoke at nine of the ten hearings, they did not explicitly raise the argument that the Board had a discriminatory motive toward African American CTU

members in selecting the ten schools for turnaround. The CTU representative at the Stagg hearing referred to reductions in African American teachers following turnarounds and school closings on the south and west sides of Chicago, however. Following each hearing, the hearing officers prepared reports, all of which recommended approval of the proposed turnarounds.

Next, the CPS portfolio office prepared a briefing on the proposed turnarounds for the February 22, 2012 Board meeting. After receiving and reviewing this information at the meeting, the Board voted to turn around the ten schools. The Board entered into management contracts with AUSL for six of the turnaround schools, while CPS' Office of School Improvement managed the turnarounds for CVCA, Smith, Tilden, and Woodson.

At the end of the 2011-2012 school year, all teachers and PSRPs working at the ten 2012 turnaround schools, including the individual Plaintiffs, received notices of termination. Garrett, an African American male, taught at Tilden during the 2011-2012 school year. Garrett was transferred to the reassigned teachers pool in July 2012. In November 2012, Garrett received a full-time position at Marshall High School, where he remained as a full-time teacher through the 2013-2014 school year. Green, an African American male, taught at CVCA during the 2011-2012 school year. Brown, an African American male, taught at Woodson during the 2011-2012 school year. Due to the turnarounds at CVCA and Woodson, Green and Brown received termination notices on June 30, 2012.

## IV. The 2013 Turnarounds

The 2013 turnaround process closely mirrored that undertaken in 2012. After identifying the schools eligible for turnaround based on their probation status, the Board narrowed the list first to sixty-eight schools and further to fifteen schools in March 2013. In narrowing the list, the Board considered the lowest academically performing schools based on their 2011-2012 APP

scores and then excluded schools that fell outside the geographic preferences of the recommended turnaround operators, AUSL and Matchbox.  The Board also looked for chronically struggling schools, which it defined as schools having less than 33% of APP points over the previous two years and ones lacking promising leadership.  Ultimately, the CPS CEO recommended five elementary schools for turnaround: Carter, Chalmers, Dewey, Lewis, and O'Keeffe.  All five were Level 3 schools that had been on probation for at least five years.  They generally performed below the geographic network and district averages across the APP metrics.[4]  The Board held public hearings on these schools in May 2013, after which the hearing officers recommended approving all five proposed turnarounds.  As in 2012, although CTU representatives spoke at the public hearings, they did not claim that the turnarounds discriminated against African American CTU members.  The Board voted to turn these five schools around on May 22, 2013.  The Board provided CTU members in turnaround schools with notice of termination on June 14, 2013.

## V.      The 2014 Turnarounds

The Board again followed a similar process in considering schools for turnaround in 2014.  As part of the process, because of the Board's transition from the APP to the SQRP, the Board considered both NWEA-MAP and ISAT test scores, as well as the 5 Essentials Survey results and attendance, on-track, and suspension rates.[5]  In February 2014, the Board narrowed the list of potential turnaround schools to six elementary schools, and the CPS CEO ultimately recommended three for turnaround: Dvorak, Gresham, and McNair.  All three were Level 3

---

[4] Chalmers did have a higher attendance percentage than the network and district average and a slightly higher ISAT science percentage than the network average.  Similarly, O'Keeffe performed .1% better on the ISAT science score than the network average.

[5] Although the 2014 Turnarounds considered additional metrics than those included in the APP, the Court generally refers to academic performance measures using the APP shorthand.

schools that had been on probation for at least six years, with McNair having been on probation for fourteen. These three turnaround schools also generally performed below the geographic network and district averages on various APP metrics.[6] In April 2014, the Board held public hearings on the proposed turnarounds. CTU representatives again did not raise an argument that the turnarounds discriminated against African American CTU members. The hearing officers recommended approving all three proposed turnarounds. The Board voted to approve turning around Dvorak, Gresham, and McNair on April 24, 2014. Affected teachers and PSRPs received notices of termination thereafter.

## VI.    Post-Turnaround School Performance

The success of turnarounds is an open debate. According to Plaintiffs' expert, Dr. Tina Trujillo, a professor of educational policy and politics at University of California, Berkeley's Graduate School of Education, empirical evidence does not show consistent positive academic or non-academic effects associated with layoff-driven reforms such as turnarounds or reconstitutions. But the Board's expert, Dr. Brian Jacob, a professor of education policy, economics, and education in the Gerald R. School of Public Policy at the University of Michigan, notes that a 2012 CCSR report showed that earlier CPS turnarounds had moderate success.

Of the eighteen schools turned around between 2012 and 2014, Dvorak, O'Keeffe, Smith, Stagg, Tilden, and Woodson received lowest performing schools designations on the Illinois State Board of Education School Report Card for the 2019-2020 school year. On the other hand, Carter, CVCA, Dewey, Gresham, Herzl, Marquette, McNair, and Piccolo received commendable designations. A March 2014 Board evaluation showed that five of the six 2012 turnaround schools that AUSL operated had improved performance on the ISAT composite in the 2012-

---

[6] Gresham did perform slightly better than the network average on the ISAT science component.

2013 school year, while one school saw a decline. All six remained below the district average. Four of the six schools improved their percentage of APP points, while the other two saw declines. As for attendance, two schools saw small increases, two saw small declines, and two remained approximately the same.

Of the 2013 turnaround schools, by the 2017-2018 school year, Dewey had attained a Level 1 rating with 3.6 SQRP points, Lewis had a Level 2+ rating with 3 SQRP points, and O'Keeffe had a Level 2 rating with 2.8 SQRP points. Three schools with similar academic performance metrics in 2013 but that CPS did not turn around—Parkside, Mason, and Aldridge—had become Level 1+ schools by the 2017-2018 school year. The other two 2013 turnaround schools—Carter and Chalmers—achieved Level 1 ratings for the 2017-2018 school year. Of five schools similar to Carter and Chalmers in the 2012-2013 school year that CPS did not turn around—Carnegie, Parker, Earle, Shoop, and Till—two became Level 1+ schools by the 2017-2018 school year and all received higher SQRP points that year than Chalmers. Three of the five comparison schools also had more SQRP points than Carter for the 2017-2018 school year.

As for the 2014 turnarounds, eleven schools with similar academic performance to McNair, Gresham, and Dvorak in the 2013-2014 school year all became Level 1 or Level 1+ schools by 2017.[7] Gresham achieved a Level 1+ rating by 2017 and, with Lavizzo and Parkside, had the highest total SQRP points of that grouping. McNair also achieved a Level 1 rating, while Dvorak received a Level 2+ rating and had the lowest number of SQRP points of the fourteen schools.

---

[7] These eight schools are Aldridge, Bass, Bennett, Bond, Jackson, Lavizzo, Manierre, Mason, Parkside, Ryder, and Till.

**VII.    Role of Teacher Performance and Student Demographics in Academic Performance Measurements**

The metrics and process the Board used to select schools for turnaround did not consider individual teachers' and PSRPs' job performance or effectiveness.  Approximately 73% of the teachers in the 2012 turnaround schools received excellent or superior ratings.  By comparison, approximately 84.2% of teachers systemwide received excellent or superior ratings in 2012. Approximately 60% of the teachers in the 2013 turnaround schools were rated excellent or superior, with the percentage increasing to 76% (and nearly 30% with a superior rating) for the teachers in the 2014 turnaround schools.

Although academic performance metrics did not directly account for individual teachers' job performance, the Board's expert, Dr. Jacob, found that, for the 2010-2011 school year when considering all CPS schools, a statistically significant and negative correlation existed between teacher evaluations and a school's percentage of APP points that implied that schools with low APP scores had more unsatisfactorily rated teachers.  Additionally, Dr. Jacob found that the 5 Essentials Survey metrics of supportive environment and ambitious instruction were statistically significant and moderately correlated with a school's total APP points.

From at least 2009 to 2015, schools with higher percentages of African American students had higher percentages of African American teachers and PSRPs.  The Board knew of this correlation.  From at least 2009 to 2013, ISAT test scores were correlated to the race, ethnicity, and free and reduced lunch status of a school's students, with lower test scores correlated with higher percentages of African American students.  CPS schools with higher percentages of African American students also had lower APP scores to a statistically significant degree at the 99% confidence level.  The Board received a presentation at its October 2011 meeting that reported that the gap in reading and math standardized test scores between white,

11

African American, and Latino CPS elementary students was larger than the national gap and was steadily increasing. Additionally, from at least 2009 to 2013, CPS schools with higher shares of African American students were more likely to be rated Level 3, on probation, and selected for turnaround, even when controlling for value-added scores, to a statistically significant degree at the 99% confidence level.

Plaintiffs' expert Dr. Bruce Baker, a professor of educational theory, policy, and administration at Rutgers, the State University of New Jersey, opined that the Board should not have used the APP in selecting schools for turnaround because the APP does not attempt to isolate individual employees' effectiveness and the APP's metrics largely reflect students' race and socioeconomic status. Dr. Baker found that the proportion of African American students at a CPS school was highly correlated with the proportion of students at that school who were low income. Dr. Jacob's regressions show that the percentage of African American students at a school was a statistically significant predictor of whether the school was a turnaround school, while student poverty (as reflected by the percentage of free lunch students) was not. He further concluded that the relationship between student poverty and APP points was larger than the relationship between students' race and academic performance at all CPS schools, although race and performance were correlated to a statistically significant degree.

## VIII. Comparison of Percentage of African American and Caucasian Teachers at Turnaround Schools and Similarly Situated Schools Not Chosen for Turnaround

For illustrative purposes, the parties have provided information about the racial composition of teachers and PSRPs at certain schools selected for turnaround in 2012, 2013, and 2014, in addition to that at other allegedly comparable schools. The following table compares the number of African American and Caucasian teachers at Tilden and CVCA, the high schools selected for turnaround in 2012, and other high schools not chosen for turnaround that had

12

similar academic performance records:[8]

|  | APP Points | Years on Probation | Teachers and PSRPs | |
|---|---|---|---|---|
|  |  |  | African American | Caucasian |
| CVCA | 26.2% | 10 | 72% | 19% |
| Tilden | 46.8% | 8 | 56% | 13% |
| Amundsen | 38.9% | 2 | 0% | 62% |
| Clemente | 46% | 16 | 19% | 37% |
| Crane | 8.7% | 16 | 70% | 0% |
| Curie | 35% | 3 | 18% | 44% |
| Foreman | 39.7% | 4 | 0% | 56.3% |
| Greater Lawndale | 33% | 1 | 17% | 42% |
| Hancock | 42% | 5 | 0% | 55% |
| Juarez | 38% | 9 | 11% | 42% |
| Kelvyn Park | 23.8% | 16 | 3% | 61% |
| Kennedy | 38% | 8 | 23% | 48% |
| Manley | 30.2% | 16 | 66.7% | 0% |
| Robeson | 42.1% | 16 | 74.7% | 0% |
| Roosevelt | 39.7% | 7 | 13% | 49% |
| Schurz | 39.7% | 8 | 0% | 59% |
| Senn | 42.9% | 8 | 0% | 66% |
| Steinmetz | 40.5% | 8 | 0% | 60% |
| Sullivan | 35.7% | 7 | 0% | 52% |
| Voise | 46% | 1 | 0% | 59% |
| Wells | 45% | 16 | 21% | 49% |

Doc. 297 ¶¶ 133–35.

A comparison of Chalmers, one of the schools selected for turnaround in 2013, with several other CPS elementary schools not chosen for turnaround that year shows that the percentage of African American teachers at Chalmers exceeded that for other CPS schools with similar academic performance:

---

[8] The parties also provide data for elementary schools with similar APP points that were on probation in 2011. Doc. 297 ¶ 134. The Court does not include these elementary schools in the chart because the APP used somewhat different metrics for elementary and high schools.

|  | APP Points | Years on Probation | Teachers and PSRPs | |
|---|---|---|---|---|
|  |  |  | African American | Caucasian |
| Chalmers | 40.5% | 6 | 70% | 17% |
| Everett | 40.5% | 2 | 9% | 52% |
| Holden | 40.5% | 2 | 18% | 48% |
| McAuliffe | 40.5% | 3 | 2% | 50% |

Doc. 297 ¶ 137.  The same conclusion appears when comparing Carter, another school turned around in 2013, with other CPS schools with similar academic performance:

|  | APP Points | Years on Probation | Teachers and PSRPs | |
|---|---|---|---|---|
|  |  |  | African American | Caucasian |
| Carter | 38.1% | 6 | 81% | 12% |
| Brentano | 35.7% | 1 | 10% | 42% |
| Hay | 38.1% | 5 | 40% | 50% |
| Hearst | 38.1% | 5 | 28% | 47% |
| Kilmer | 38.1% | 1 | 8% | 43% |
| Pilsen | 35.9% | 1 | 3% | 47% |

Doc. 297 ¶ 138.

Finally, the following chart compares McNair, one of the schools selected for turnaround in 2014, with several other CPS elementary and middle schools that the Board did not turn around that year:

|  | APP Points | Years on Probation | Teachers and PSRPs | |
|---|---|---|---|---|
|  |  |  | African American | Caucasian |
| McNair | 26.2% | 14 | 58% | 35% |
| Ames | 28.6% | 1 | 17% | 40% |
| McAuliffe | 31% | 4 | 2% | 51% |
| Thurgood Marshall | 19% | 5 | 4% | 87% |

Doc. 297 ¶ 139.

## IX.    Impact of Turnarounds on African American Teachers and PSRPs

The Board does not directly select teachers and staff at its schools.  Instead, applicants apply directly to a CPS school and then the principal submits recommendations to the Board for approval.  The Board did, however, keep track of the race of students and employees at schools impacted by turnarounds.  After the 2009-2010 and 2012-2014 turnarounds, the population of Caucasian teachers and PSRPs at the turnaround schools increased while the population of African American teachers and PSRPs decreased.  In December 2011, the Board knew of a net loss of African American teachers in nine of the eleven schools turned around between 2007 and 2011 and managed by AUSL.  The Board also knew that the turnarounds and other school actions it took between 2012 and 2016 disproportionately impacted African American employees when compared to non-African American employees.  In 2006, approximately 33% of CPS teachers were black, a number that decreased to 21% in 2017.

To further address whether the turnarounds had a statistical impact on African American teachers and PSRPs, the parties rely on their experts, Dr. Jonathan Walker, who has a Ph.D. in Economics and is the President and Chief Executive Officer of Economists Incorporated, and Dr. David Blanchflower, who has a Ph.D. in Economics and is an economics professor at Dartmouth College.  The results of their statistical analysis follow.

### A.    Pre-2012 Turnarounds

Between 2006 and 2010, the Board turned around sixteen schools.  These turnarounds had an adverse impact on African American CTU members when race was the only variable used in the regression.  In other words, being African American had a strong and statistically significant positive impact on the prospect of a CTU member working at a turnaround school. The selection rates for Caucasian CTU members were approximately 32% (in 2008), 20% (in

15

2009), and 23% (in 2010) of the selection rates for African American CTU members. These selection rates were statistically significant to a virtual certainty.

But when controlling for elements of the Board's stated performance criteria, Dr. Blanchflower's regressions for 2008 to 2010 at the school level show no statistically significant effect on African American CTU members in the selection of schools for turnaround. Dr. Walker did not perform any regression analysis concerning the selection of schools for turnaround between 2008 and 2010. Instead, looking at the impact on individual teachers and PSRPs, Dr. Walker found a statistically significant correlation between the percentage of African American CTU members at a school and that school's academic performance in 2008 when considering six of the eight performance metrics Dr. Blanchflower used for his analysis (the school's successive years on probation, 2008 APP points, attendance change between 2005 and 2007, the ACT Educational Planning and Assessment System ("EPAS") reading gain, and 2007 Prairie State Achievement Exam ("PSAE") reading and math scores). A statistically significant correlation also existed in 2008 between the absolute number of African American CTU members in a school and that school's performance on six of Dr. Blanchflower's metrics (years on probation, 2008 APP points, attendance changes from 2005 to 2007 and 2007 to 2008, EPAS reading gain, and 2007 PSAE math). For 2009 and 2010, Dr. Walker found a statistically significant correlation between the percentage and absolute number of African American CTU members at a school and that school's performance based on all metrics that Dr. Blanchflower considered for those years (PSAE/ISAT scores, successive years of probation, and 2008 APP points). Dr. Walker thus concluded that selecting schools for turnaround based on academic performance metrics could have a discriminatory effect.

### B.    2012 Turnarounds

For the 2011-2012 school year, 35.4% of all CPS employees were African American. 51% of CPS employees working at the first cut of eligible schools for turnaround were African American.  At the second cut, 53.3% of CPS employees at turnaround eligible schools were African American.  Ultimately, 60.2% of CPS employees at the ten schools chosen for turnaround were African American.  The 2012 turnarounds affected 400 CTU members, including 215 African Americans and 100 Caucasians.  The percentage of CTU African American and Caucasian members at each turnaround school was as follows:

|  | African American | Caucasian |
|---|---|---|
| Casals | 17% | 43% |
| CVCA | 72% | 19% |
| Fuller | 80% | 13% |
| Herzl | 69% | 22% |
| Marquette | 19% | 48% |
| Piccolo | 35% | 32% |
| Smith | 83% | 17% |
| Stagg | 87% | 6% |
| Tilden | 56% | 18% |
| Woodson | 81% | 13% |

Doc. 297 ¶ 42.

When race was the only control variable and schools' academic performance was excluded as a control variable, Dr. Walker and Dr. Blanchflower agree that the percentage of African American employees was a statistically significant predictor of a school being chosen for turnaround across all schools in CPS and when comparing African Americans to all other employees.  Additionally, when using race as the only control variable, African American employees had a statistically significant greater probability of being in a turnaround school when analyzing each cut of the selection process and when comparing African Americans to all other

17

employees.  Dr. Walker also found a statistically significant correlation between whether a school was on probation and the racial composition of the workforce.

But when Dr. Walker and Dr. Blanchflower controlled for academic performance and race, the African American variable was not statistically significant and the academic performance variable was statistically significant.  Dr. Walker, however, found a negative, statistically significant correlation between African American workforce representation and a school's APP points as well as a positive, statistically significant correlation between Caucasian workforce representation and a school's APP points.  This led Dr. Walker to conclude that selecting schools for turnaround based on performance points could serve as a method to select schools based on race.

Of the 400 CTU members employed in the ten 2012 turnaround schools, 346 (86.5%) continued to receive full salary and benefits, including pension service and contribution credits, either in the reassignment pool or in full-time positions as of September 1, 2012 for the 2012-2013 school year.  Of the 215 African American CTU members affected by the 2012 turnarounds, thirty-one (14.4%) did not find full-time positions with CPS by the end of the 2012-2013 school year and did not retire, instead finding themselves honorably terminated.  Of the 100 affected Caucasian CTU members, fourteen (14%) did not find full-time positions with CPS by the end of the 2012-2013 school year and did not retire, which again led to honorable termination.  The difference in the layoff rate for African American and Caucasian CTU members is not statistically significant.

## C.    2013 and 2014 Turnarounds

Using race as the only control variable, Dr. Walker found an adverse impact on African American CTU members in schools selected for turnaround in 2013 and 2014.  In 2013, out of

18,705 CTU members systemwide, 5,029 (27%) were African American and 8,084 (43%) were Caucasian. Of the 158 CTU members employed at the 2013 turnaround schools, 114 (72%) were African American and thirty (19%) were Caucasian. For 2013, using race as the only control variable, the disparity between the percentage of African American employees at the 2013 turnaround schools and African American employees systemwide (72% compared to 27%) is statistically significant at the 99% confidence level, as is the disparity between the percentage of Caucasian employees at the 2013 turnaround schools and Caucasian employees systemwide (19% compared to 43%). Further, when controlling only for race, the Caucasian selection rate (0.4%) for the 2013 turnarounds was approximately 16% of the African American selection rate (2.3%), with the disparity between the African American and Caucasian selections rates statistically significant at the 99% confidence level.

In 2014, of the 17,849 CTU members systemwide, 4,648 (26%) were African American and 7,703 (43%) were Caucasian. Of the eighty-seven CTU members employed at the 2014 turnaround schools, sixty-three (72%) were African American and nineteen (22%) were Caucasian. The disparity between the African American employment percentage at the 2014 turnaround schools and the African American employment percentage systemwide (72% compared to 26%) is statistically significant at the 99% confidence level, as is the disparity between the Caucasian employment percentage at the 2014 turnaround schools and that systemwide (22% compared to 43%). Further, controlling only for race, the Caucasian selection rate (0.2%) for the 2014 turnarounds was approximately 18% of the African American selection rate (1.4%), with the disparity between the African American and Caucasian selection rates statistically significant at the 99% confidence level.

19

When using APP points as a control for academic performance, however, Dr. Blanchflower concluded that the African American variable was not statistically significant, while the academic performance variable was statistically significant and negative. Additionally, in his regressions across multiple years (2009-2014, 2009-2010, and 2012-2014) that included race and APP points as variables, Dr. Blanchflower found the African American variable statistically insignificant. Aside from one regression that added "other minority" as a control, the academic performance variable was significant and negative. Dr. Blanchflower's estimated regression results allowed him to reject the null hypothesis that race had no impact on the probability of turnaround.

Dr. Walker did not estimate any regressions or report any tables that controlled for academic performance for 2013 or 2014. Instead, using a probit analysis, which measures the effect of race on individual CTU members' probabilities of being impacted by a turnaround, Dr. Walker found that, for 2013 and 2014, when academic performance was not used a control, race was a statistically significant predictor of being impacted by a turnaround in 2013 and 2014. Dr. Walker's school level analysis also showed that schools selected for turnaround in 2013 and 2014 were racially different to a statistically significant degree at the 95% confidence level, i.e. turnaround schools had disproportionately high percentages of African American CTU employees and disproportionately low percentages of Caucasian CTU employees. Dr. Walker therefore found it appropriate to reject his null hypothesis that the selection process was race neutral when analyzed at the school level and instead found that the academic performance metrics Dr. Blanchflower used can mask the disparities in the rates of African American and Caucasian teachers and PSRPs in schools selected for turnaround.

### X.    Proposed Turnaround Alternatives

Dr. Trujillo suggested five less discriminatory and more effective alternatives to turnarounds: (1) expanding the turnaround framework to include multiple measures to evaluate school effectiveness, (2) implementing a district-wide desegregation plan, (3) reducing class size, (4) investing in early childhood education programs, and (5) implementing full-service community schools. Dr. Trujillo did not draft a plan to implement any of her proposed reforms, however, nor did she know the cost of implementing any of her proposed alternatives or how long it would take for such alternatives to begin improving academic performance. Although Dr. Trujillo did not consider the APP in preparing her report, she noted similarities between the APP and performance measures used in other large urban school districts. The Board has implemented some early childhood education programs, although not those Dr. Trujillo recommends, and has begun to implement some community school reforms as well.

Dr. Baker also testified that a better alternative performance policy would address the underlying causes of schools' performance, including CPS' concentrated poverty and the racial composition of neighborhoods. Dr. Baker acknowledged, however, that he did not know of any other large city school systems in the 2011-2012 year that used radically different measures for rating their schools for No Child Left Behind compliance purposes. Dr. Jacob testified that, although the APP was not perfect, it served as a reasonable approach to school accountability.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine dispute of material fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, documents, answers to

21

interrogatories, admissions, stipulations, and affidavits or declarations that are part of the record. Fed. R. Civ. P. 56(c)(1); *A.V. Consultants, Inc. v. Barnes*, 978 F.2d 996, 999 (7th Cir. 1992). The party seeking summary judgment bears the initial burden of demonstrating that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Bunn v. Fed. Deposit Ins. Corp. for Valley Bank Ill.*, 908 F.3d 290, 295 (7th Cir. 2018). In response, the non-moving party cannot rest on mere pleadings alone but must use the evidentiary tools listed above to identify specific material facts that demonstrate a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 324; *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). The Court must construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Wehrle v. Cincinnati Ins. Co.*, 719 F.3d 840, 842 (7th Cir. 2013). However, a bare contention by the non-moving party that an issue of fact exists does not create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), and the non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture,'" *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted). The same standard applies when considering cross-motions for summary judgment. *Int'l Bhd. of Elec. Workers, Local 176 v. Balmoral Racing Club, Inc.*, 293 F.3d 402, 404 (7th Cir. 2002). Therefore, when considering Plaintiffs' motion for summary judgment, the Court views all evidence in the light most favorable to the Board, and when considering the Board's motion for summary judgment, the Court views all evidence in the light most favorable to Plaintiffs. *Id.*

## ANALYSIS

Plaintiffs bring four claims: (1) Title VII race discrimination based on disparate treatment, (2) Title VII race discrimination based on disparate impact, (3) § 1981 race

22

discrimination,[9] and (4) § 1983 equal protection violation.[10]  The same framework applies to the Title VII disparate treatment, § 1981, and § 1983 claims.  *See Waddy v. Bd. of Educ. of City of Chicago*, No. 02-1231, 2014 WL 3732573, at \*3 (N.D. Ill. July 24, 2014).  Therefore, the Court streamlines its discussion to consider whether either side has established that no material issues of fact exist that would entitle them to judgment on Plaintiffs' claims of (1) disparate impact and (2) disparate treatment based on a policy or practice with respect to the 2012, 2013, and 2014 turnarounds.[11]

## I.     Title VII Claims based on 2014 Turnarounds

Before addressing the substantive merits of Plaintiffs' claims, the Court must address the Board's argument that CTU did not properly exhaust the Title VII claims based on the 2014 turnarounds.  A plaintiff "may bring only those claims that were included in his EEOC charge, or that are 'like or reasonably related to the allegations of the charge and growing out of such allegations.'"  *Geldon v. S. Milwaukee Sch. Dist.*, 414 F.3d 817, 819 (7th Cir. 2005) (quoting *McKenzie v. Ill. Dep't of Transp.*, 92 F.3d 473, 481 (7th Cir. 1996)).  This requirement is intended to provide the employer with notice of the nature of the claims against it and provide the EEOC and the employer the opportunity to settle the dispute with the employee before the parties turn to litigation.  *Id.*  A new claim is "like or reasonably related" to the claim raised in

---

[9] Although § 1981 does not create a private right of action against state actors, § 1983 continues to provide a remedy for § 1981 violations committed by state actors.  *Campbell v. Forest Pres. of Cook Cnty.*, 752 F.3d 665, 671 (7th Cir. 2014).

[10] Plaintiffs acknowledge that they only rely on § 1983 as the vehicle by which to pursue their § 1981 claims.  Doc. 312 at 29.  In its opening brief, the Board argued that the statute of limitations barred Plaintiffs' § 1983 claims based on the 2013 turnarounds.  The Board withdrew this argument in its reply, Doc. 311 at 28 n.6, and so the Court does not discuss it further.

[11] The Court has already determined that all class members suffered an adverse employment action when they received termination notices following the turnaround decisions.  *See* Doc. 289 at 15–19.  The Board accepts this as law of the case for purposes of summary judgment but reserves the right to appeal the issue.  Doc. 309 at 14 n.2.

23

the EEOC charge when (1) "there is a reasonable relationship between the allegations in the charge and the claims in the complaint" and (2) "the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge." *Cheek v. W & S. Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir. 1994). "The relevant claim and the EEOC charge must, at a minimum, describe the same conduct and implicate the same individuals." *Huri v. Off. of the Chief Judge of the Cir. Ct. of Cook Cnty.*, 804 F.3d 826, 831–32 (7th Cir. 2015).

CTU acknowledges that it did not file an EEOC charge with respect to the 2014 turnarounds but argues that its claims concerning the 2014 turnarounds involve the same theory, conduct, and parties as the 2013 turnarounds, for which it filed an EEOC charge. The 2013 turnarounds charge states that CPS and the Board "instituted a class-wide school 'turnaround' policy and practice (i.e. reconstitution) that has resulted in the wholesale termination of all faculty and staff from five schools" and that those terminations "were directed to schools with predominantly African American teacher populations." Doc. 297-29 at 49. CTU indicated in the charge that it complained of a continuing action, with the date of discrimination beginning on June 14, 2013, when displaced teachers and PSRPs received notice of their termination, and continuing through the time of filing in April 2014.

Although the adverse employment actions at issue here are considered discrete acts for statute of limitations purposes, *see Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113–14 (2002) (discrete acts that "start[ ] a new clock for filing charges" include "termination, failure to promote, denial of transfer, or refusal to hire"), their discrete nature does not preclude a finding that claims concerning the 2014 turnarounds fall within the scope of the 2013 turnarounds charge, *see Tolston-Allen v. City of Chicago*, No. 16-cv-6981, 2017 WL 951252, at *3 n.2 (N.D. Ill. Mar. 8, 2017) (*Morgan*'s discussion of discrete acts involves the question of whether the

24

statute of limitations bars a claim and so is inapposite to the question of whether a plaintiff administratively exhausted a claim). As relevant to the exhaustion analysis, the 2013 turnarounds charge involves the same conduct and the same decisionmakers as the 2014 turnarounds. CTU alleges that the Board used the same allegedly discriminatory policy with respect to both the 2013 and 2014 turnarounds. Given that the process for determining which schools to turn around in 2014 had already started at the time that CTU filed the EEOC charge related to the 2013 turnarounds and CTU indicated that the violation continued through the time of filing, the EEOC's investigation into the 2013 turnarounds reasonably could have grown to include the 2014 turnarounds.[12] Therefore, it is likely that the EEOC and the Board could foresee that CTU's claims would extend to the 2014 turnarounds. Although CTU could have easily avoided the question of whether it properly exhausted the Title VII claims related to the 2014 turnarounds by filing an additional charge or seeking to supplement the 2013 turnarounds charge, the Court finds that, in this instance, the Title VII claims related to the 2014 turnarounds

---

[12] Some courts have found that claims concerning post-charge conduct are not reasonably related to an earlier EEOC charge because the post-charge conduct occurred after the filing of the charge. *See, e.g.*, *Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 680 (7th Cir. 2005) ("[I]t would have been impossible to describe the conduct related to her December 2002 non-promotion in her EEOC charges dated November 1, 2002. There was no way for the EEOC to undertake preliminary investigation as contemplated by Title VII's statutory design."); *Kulumani v. Blue Cross Blue Shield Ass'n*, 224 F.3d 681, 685 (7th Cir. 2000) (failure to rehire claim not exhausted where EEOC charge filed before plaintiff applied for the position); *Richardson v. Swift Transp. Co. of Az., LLC*, No. 17 C 4046, 2018 WL 1811332, at *4 (N.D. Ill. Apr. 17, 2018) (although claim was based on the same conduct alleged in the EEOC charge, the fact that the adverse act occurred after the filing of the charge meant that the claim was "necessarily outside the scope of the Charge"). Because the Board had already begun the process of determining the schools to turn around in 2014 at the time CTU filed the 2013 turnarounds charge, with the Board making its final decision on the 2014 turnarounds the same month as the filing of the charge and before the EEOC's investigation concluded, the Board and the EEOC could reasonably have expected that the EEOC's investigation would also include the 2014 turnarounds. *Cf. Conner*, 413 F.3d at 678 (claims based on post-charge conduct were not reasonably related to EEOC charge because the EEOC investigation had concluded before the post-charge conduct occurred).

fall within the scope of the 2013 turnarounds charge.[13] *See Ammons v. Metro. Water Reclamation Dist. of Greater Chicago*, No. 08 C 5663, 2011 WL 5507370, at *4–5 (N.D. Ill. Nov. 9, 2011) (certain post-charge conduct was reasonably related where it "should easily have been discovered in the EEOC's investigation" and "describes the same conduct and implicates the same individuals").

## II.    Disparate Impact

Disparate impact claims encompass "practices that are not intended to discriminate but in fact have a disproportionately adverse effect on minorities." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009).  "To succeed on a disparate impact claim, plaintiffs bear the burden of showing that a particular employment practice causes a disparate impact on the basis of race." *Allen v. City of Chicago*, 351 F.3d 306, 311 (7th Cir. 2003).  Once Plaintiffs make this *prima facie* case, the burden shifts to the Board to show the practice is "job related" and "consistent with business necessity." *Id.* (quoting 42 U.S.C. § 2000e–2(k)(1)(A)(i)).  If the Board makes this showing, the burden shifts back to Plaintiffs to demonstrate that the Board had an available, equally valid, and less discriminatory alternative that it refused to use. *Adams v. City of Chicago*, 469 F.3d 609, 613 (7th Cir. 2006) (citation omitted).

### A.    *Prima Facie* Case

To establish a *prima facie* case of disparate impact, Plaintiffs must (1) "isolate and identify 'the specific employment practices that are allegedly responsible for any observed statistical disparities'" and (2) "demonstrate causation by offering 'statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group.'" *Vitug v. Multistate*

---

[13] Even if CTU did not properly exhaust the Title VII claims related to the 2014 turnarounds, CTU still could pursue its § 1981 disparate treatment claim related to those turnarounds given that § 1981 does not include an exhaustion requirement.

*Tax Comm'n*, 88 F.3d 506, 513 (7th Cir. 1996) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988)).

First, Plaintiffs must identify a specific practice; "it is not enough to simply allege that there is a disparate impact on workers, or point to a generalized policy that leads to such an impact." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). Rather, to satisfy this requirement, Plaintiffs must identify a specific test, requirement, or practice within a general policy that has a disparate impact. *See id.* While the Board focuses on the entire turnaround process as the employment practice at issue, Plaintiffs zoom in on two of the turnaround process' features: (1) the use of probation at the first stage of selecting schools for turnaround and (2) the use of APP points to further narrow the schools for turnaround. Plaintiffs contend that the use of these metrics to narrow the schools eligible for turnaround was discriminatory and infected the entire process. The Board does not meaningfully argue that these two features of the selection process do not qualify as specific employment practices. Indeed, as the Seventh Circuit recognized when addressing the question of class certification in this case, "an early discriminatory process can taint the entire process." *Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 436 (7th Cir. 2015); *see also Connecticut v. Teal*, 457 U.S. 440, 451 (1982) ("The suggestion that disparate impact should be measured only at the bottom line ignores the fact that Title VII guarantees these individual respondents the *opportunity* to compete equally with white workers on the basis of job-related criteria.").

Next, Plaintiffs must show that the use of probation and APP points in selecting schools for turnaround caused class members harm because of their race. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 657 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k). A disparate impact claim that relies on a statistical disparity but fails to demonstrate a

causal connection does not suffice. *See Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc.*, 576 U.S. 519, 542 (2015). "A robust causality requirement ensures that '[r]acial imbalance . . . does not, without more, establish a prima facie case of disparate impact' and thus protects defendants from being held liable for racial disparities they did not create." *Id.* (alterations in original) (quoting *Wards Cove*, 490 U.S. at 653). That said, no "rigid mathematical formula" for causation exists, with the Supreme Court instead only "consistently stress[ing] that statistical disparities must be sufficiently substantial that they raise an inference of causation." *Watson*, 487 U.S. at 995. "[T]he defendant can always present evidence to show that there was no disparate impact—that it is merely an artifact of the plaintiff's statistical study." *Allen v. Seidman*, 881 F.2d 375, 379 (7th Cir. 1989).

Here, Plaintiffs present Dr. Walker's analysis that a statistically significant correlation existed between a school's probation status and the racial composition of its workforce in 2012, 2013, and 2014. Similarly, Dr. Walker found that selecting schools for turnaround based on APP points could have been used as a method to select schools based on race. Further, Dr. Walker concluded that race had a statistically significant impact at every step of the turnaround selection process in 2012. And the Board's expert, Dr. Blanchflower, accepted the fact that, at a raw data level, a statistically significant correlation existed between the probability of a school being turned around and the proportion of African American CTU members at that school. This statistical evidence, according to Plaintiffs, satisfies their burden of demonstrating causation.

The Board responds that Plaintiffs' statistical evidence is flawed because Dr. Walker used a simple regression analysis and ignored potentially explanatory variables, specifically, academic performance. *See Mozee v. Am. Com. Marine Serv. Co.*, 940 F.2d 1036, 1047 (7th Cir. 1991) ("The plaintiffs' analysis must take into account the major variables one might expect to

cause a statistical disparity.").  Both Dr. Blanchflower, the Board's expert, and Dr. Walker agree that, when controlling for academic performance, the turnarounds had no statistically significant impact on African American teachers or PSRPs in 2012, 2013, and 2014.  As the Court previously recognized, Dr. Blanchflower's analysis weakens Plaintiffs' *prima facie* case.  Doc. 289 at 28; *see Coates v. Johnson & Johnson*, 756 F.2d 524, 544 (7th Cir. 1985) ("By including the factor and showing that the statistics no longer indicate discrimination, the defendant responds to the particular proof used by the plaintiffs to establish their prima facie case and thus raises a genuine issue of fact as to whether the apparent disparate treatment is in fact due to discrimination.").

Plaintiffs respond to Dr. Blanchflower's analysis by arguing that the academic performance index he used in the regression model cancelled a separate supposed racially disparate effect.  "[A] defendant may not offer as a nondiscriminatory explanation for the disparity in plaintiffs' statistics a factor that is itself a subject of discrimination."  *Mozee*, 940 F.2d at 1048.  "[O]nce a defendant offers statistics using an allegedly biased factor, the plaintiff must bear the burden of persuading the factfinder that the factor is biased."  *Coates*, 756 F.2d at 544.  The Board acknowledges that Dr. Blanchflower measured academic performance by considering a school's percentage of APP points.  Plaintiffs contend that because the Board's academic performance variable is substantively identical to the challenged practices, including that variable in a regression analysis makes it impossible to isolate the effect of the specific employment practices at issue.  *See Reed Constr. Data Inc. v. McGraw-Hill Cos.*, 49 F. Supp. 3d 385, 404 (S.D.N.Y. 2014) ("Multicollinearity problems typically arise when the independent variable is correlated with one of the control variables.  If the control variables move together with the independent variable, it becomes impossible to isolate the effect of the independent

variable on the dependent variable—which, after all, is the goal of regression analysis."), *aff'd*, 638 F. App'x 43 (2d Cir. 2016). To that point, Dr. Walker opined that the academic performance index Dr. Blanchflower used was correlated to employees' race, meaning that the index can mask disparities in the rates at which African American and Caucasian employees were selected for turnaround. The Board responds that a correlation alone does not prove causation, *see Peters v. AstraZeneca LP*, 224 F. App'x 503, 507 (7th Cir. 2007), and many other possible explanations could exist for the correlation Dr. Walker identified. But because "scientific induction *means* inferring causality from correlation," *Tagatz v. Marquette Univ.*, 861 F.2d 1040, 1044 (7th Cir. 1988), and academic performance is measured in part by one of the allegedly problematic steps of the turnaround process, Plaintiffs have at least produced some evidence to suggest that the academic performance variable masks a discriminatory effect.

Ultimately, as the Court found in addressing the *Daubert* motions, the parties' debate about the proper variables for a regression analysis goes to the probative value of that evidence. *See Manpower, Inc. v. Ins. Co. of Pa.*, 732 F.3d 796, 808 (7th Cir. 2013) (an expert's selection of independent variables for a regression analysis impacts the probative value). Because the Court cannot weigh the competing analyses on summary judgment, whether the statistical evidence sufficiently demonstrates causation remains a question for the jury. *See Wipf v. Kowalski*, 519 F.3d 380, 385 (7th Cir. 2008) ("[I]n a case of dueling experts . . . it is left to the trier of fact, not the reviewing court, to decide how to weigh the competing expert testimony."). Although this precludes the Court from granting summary judgment in Plaintiffs' favor, the Court nonetheless proceeds to the next step in considering whether to grant the Board's motion on the disparate impact claim.

### B.     Business Necessity and Job-Related Defense

Even if Plaintiffs can establish a *prima facie* case of disparate impact, the Board could

prevail on its request for summary judgment by showing that the evidence compels a finding that

the use of APP points and probation to select schools for turnaround was "job related for the

position in question and consistent with business necessity."  42 U.S.C. § 2000e-2(k)(1)(A)(i).

The Board argues that the Court should focus only on "whether the Board's school-level

decisions were reasonable and served an important public policy goal."  Doc. 309 at 15.  But this

formulation, under which the Board claims it need not show that the turnarounds were job-

related, ignores the explicit requirements of the statute, which require that the challenged

practice be both "job related for the position in question *and* consistent with business necessity."

42 U.S.C. § 2000e-2(k)(1)(A)(i) (emphasis added); *see also Griggs v. Duke Power Co.*, 401 U.S.

424, 431 (1971) ("The touchstone is business necessity.  If an employment practice which

operates to exclude [minorities] cannot be shown to be related to job performance, the practice is

prohibited.").

Another court in this district distilled the Supreme Court's and Seventh Circuit's caselaw

on this defense to require consideration of "whether the practice bears a manifest relationship to

the employment in question, whether it is necessary to safe and efficient job performance or

essential to safe and efficient conduct of the employer's business, and whether it is consistent

with genuine business needs."  *Chicago Teachers Union, Local 1 v. Bd. of Educ. of City of

Chicago* ("*Layoff Case*"), 419 F. Supp. 3d 1038, 1050 (N.D. Ill. 2020); *see Griggs*, 401 U.S. at

432 ("Congress has placed on the employer the burden of showing that any given requirement

must have a manifest relationship to the employment in question.").  While this does not mean

that the Court must find the practice "absolutely necessary to the functioning of CPS or its

constituent schools" or that "it is based on the most essential measures of class members' and their colleagues' performance of their jobs," it requires a "'reasonably tight fit between the challenged criterion and the actual demands of the job' such that the criterion reflects a reasonable and 'practical business choice.'" *Layoff Case*, 419 F. Supp. 3d at 1050 (quoting *Aguilera v. Cook Cnty. Police & Corr. Merit Bd.*, 760 F.2d 844, 847 (7th Cir. 1985); *Inclusive Cmtys.*, 576 U.S. at 533); *see also Bryant v. City of Chicago*, 200 F.3d 1092, 1098–99 (7th Cir. 2000) ("It would be unrealistic to require more than a reasonable measure of job performance. It therefore is a matter of reasonableness, except in cases in which the plaintiff can show that the employer was using the practice as a mere pretext for discrimination.").

First, as to the necessity of the turnarounds, the Board argues that its primary responsibility is to its students and that turnarounds are an authorized option under both the collective bargaining agreements and the Illinois School Code to improve the educational opportunities for students in chronically underperforming schools. The Board points to the 2012 CCSR report showing that previous turnarounds had at least moderate success. Conversely, Plaintiffs rely on Dr. Trujillo's opinion that turnarounds that involve wholesale layoffs do not lead to significant improvements in student achievement, finding instead that such turnarounds are based on a flawed assumption that unmotivated teachers and PSRPs cause student underperformance. Additionally, both sides have presented evidence concerning how schools fared post-turnaround compared to schools that were not turned around, highlighting different factors that they contend support their position. Instead of pointing to only one conclusion as to the reasonableness and effectiveness of using probation and APP points to select schools for turnarounds to achieve the goal of improved academic performance, the evidence creates a material question of fact.

32

The same goes for whether the use of these metrics for turnarounds had a manifest relationship to teachers' and PSRPs' job performance. The Board offers Dr. Jacob's opinion that schools selected for turnaround had lower scores for ambitious instruction, instructional quality, supportive environment, and teacher evaluations. Plaintiffs argue that the Board's school-level focus does not provide a "reasonably tight fit between the challenged criterion and the actual demands of the job," *Aguilera*, 760 F.2d at 847 (quoting *Caviale v. State of Wis., Dep't of Health & Soc. Servs.*, 744 F.2d 1289, 1294 (7th Cir. 1984)), reprising their *Daubert* objections to Dr. Jacob's opinions. They maintain that the Board must instead provide a job-related reason for terminating individual class members. *See El v. Se. Penn. Transp. Auth.*, 479 F.3d 232, 240 (3d Cir. 2007) ("[E]mployers cannot rely on rough-cut measures of employment-related qualities; rather they must tailor their criteria to measure those qualities accurately and directly for each applicant."). The Court agrees with the Board that it can use school-level data as a proxy for demonstrating the required fit between turnarounds and teachers' job demands to the extent it can show that such data "measures traits that are significantly related to the applicant's ability to perform the job." *Gillespie v. Wisconsin*, 771 F.2d 1035, 1040 (7th Cir. 1985); *see* Doc. 289 at 37–39 ("Jacob's analysis of school-level data is entirely appropriate."); *Layoff Case*, 419 F. Supp. 3d at 1052 (finding that use of enrollment declines to eliminate positions met the job-related standard because such staffing adjustments were "a reasonable and practical method of staffing a school with the number of teachers and paraprofessionals reasonably necessary to serve the needs of the school's students").

As for school-level data, Plaintiffs do point out that at least certain factors of the APP, such as the ISAT standardized test and the value-added score, did not test for individual teacher or PSRP performance and instead largely reflected students' race and socioeconomic status.

33

Plaintiffs also highlight evidence in the record that over 60% or more of the teachers affected by turnarounds in 2012, 2013, and 2014 had excellent or superior ratings to rebut arguments that the turnaround schools had inferior teaching. Plaintiffs' evidence at least calls into question whether the school-level data on which the Board relied in making its turnaround decisions accurately reflected teachers' job performance. Thus, Plaintiffs have raised a question of fact as to whether the appropriate fit exists between the turnaround policy and the actual demands of their jobs. *Cf. Dothard v. Rawlinson*, 433 U.S. 321, 332 (1977) (defendants did not carry their burden to show that the challenged employment practice was job-related where they "produced no evidence correlating the height and weight requirements with the requisite amount of strength thought essential to good job performance").

Given the conflicting evidence, whether the school-level turnaround decisions were job-related and consistent with business necessity remains a question for the trier of fact. And because the Board bears the burden on this question, the Court cannot grant summary judgment for the Board on Plaintiffs' disparate impact claim and so need not consider the parties' arguments as to the availability of equally valid and less discriminatory alternatives. *See Lewis v. City of Chicago*, 560 U.S. 205, 213 (2010) ("Unless and until the defendant pleads and proves a business-necessity defense, the plaintiff wins simply by showing the stated elements.").

## III. Disparate Treatment

Next, the Court considers Plaintiffs' disparate treatment claims under Title VII, § 1981, and § 1983. Plaintiffs seek to prove disparate treatment by showing that the Board engaged in a pattern or practice of race discrimination when conducting the turnarounds.[14] *See Benjamin v.*

---

[14] Although the Board argued in its motion that Plaintiffs could not prevail on a Title VII disparate treatment claim for failure to rehire, Plaintiffs made clear in their response that they are not pursuing such a claim. Issues related to the Board's failure to rehire any of the individual class members may have relevance to damages, an individualized question that the Court would only consider if Plaintiffs establish

*Katten Muchin & Zavis*, 10 F. App'x 346, 352 (7th Cir. 2001) ("A pattern-or-practice claim is typically raised in a class action to show that an employer had a wide-ranging policy to discriminate against class members."); *Bell v. Woodward Governor Co.*, No. 03 C 50190, 2005 WL 3299179, at *3 (N.D. Ill. Aug. 31, 2005) ("Proving class-wide liability for intentional discrimination, or disparate treatment, requires a showing that an employer conducted business through a pattern or practice of discrimination."). To prevail on their pattern or practice claim, Plaintiffs must show "that racial discrimination was the [Board's] standard operating procedure—the regular rather than the unusual practice." *Teamsters*, 431 U.S. at 336. This requires showing "more than the mere occurrence of isolated or 'accidental' or sporadic discriminatory acts." *Id.* Plaintiffs may establish a *prima facie* case through "statistical evidence demonstrating substantial disparities in the application of employment actions as to minorities . . . , buttressed by evidence of general policies or specific instances of discrimination." *E.E.O.C. v. Chicago Miniature Lamp Works*, 947 F.2d 292, 297 (7th Cir. 1991) (alteration in original) (quoting *Coates*, 756 F.2d at 532). "[I]n some cases, statistical disparities alone may prove intent," but "shaky statistics may be insufficient unless accompanied by additional evidence."[15] *E.E.O.C. v. O&G Spring & Wire Forms Specialty Co.*, 38 F.3d 872, 876 (7th Cir. 1994); *see also E.E.O.C. v. Sears, Roebuck & Co.*, 839 F.2d 302, 310–11 (7th Cir. 1988)

---

that the Board had a pattern or practice of discrimination. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360–62 (1977) (discussing liability and remedial stages of pattern or practice suit, noting that at the initial liability stage, the plaintiff need not "offer evidence that each person for whom it will ultimately seek relief was a victim of the employer's discriminatory policy," with such evidence relevant instead at the remedial stage, where the Court considers "the scope of individual relief").

[15] The Board cites to *Bell v. EPA* to support its argument that statistics cannot be the "primary means of establishing discrimination in disparate treatment situations." 232 F.3d 546, 552 (7th Cir. 2000). *Bell* did not involve a pattern and practice claim, however. The *Bell* court recognized that, for a pattern or practice claim, "statistical evidence constitutes the core of a plaintiff's prima facie case." *Id.* at 553.

(rejecting argument that anecdotal evidence is always necessary to support a finding of intentional discrimination).

The parties rely on the same statistical evidence as they did for the disparate impact claim. *See Chicago Miniature Lamp Works*, 947 F.2d at 297 (same set of facts can support disparate impact and disparate treatment claims). The Court incorporates its discussion of that statistical evidence here. Because questions of fact exist as to whether the statistical evidence supports a finding of discrimination, the question remains one for the jury.

As for anecdotal evidence of intentional discrimination, Plaintiffs provide examples of schools that had lower performance points and higher percentages of Caucasian teachers that the Board passed over when deciding which schools to turn around. They also again argue that the evidence does not bear out that turnarounds achieved the intended result of improving student performance. Plaintiffs further point out that, after implementation of the turnarounds, CPS employed more Caucasian and fewer African American teachers and PSRPs than it had prior to the turnarounds. Additionally, before approving the turnarounds at issue here, the Board knew that nine of the eleven schools turned around and managed by AUSL between 2007 and 2011 experienced a net loss of African American teachers. The Board also knew that the turnarounds and school closings it undertook between 2012 and 2016 had a disproportionate impact on African American employees when compared to their non-African American counterparts but did not take any actions to limit that impact. The Board contends that "knowledge of a disparity is not the same thing as an intent to cause or maintain it." *Am. Nurses' Ass'n v. Illinois*, 783 F.2d 716, 722 (7th Cir. 1986); *Layoff Case*, 419 F. Supp. 3d at 1057 ("[T]he Court fails to see how the Board's mere awareness that the layoff might disproportionately affect African-American teachers and paraprofessionals tends to demonstrate its intent to discriminate against them.").

But Plaintiffs do not rely solely on the Board's knowledge to show intent, instead arguing that this knowledge, when taken together with other anecdotal evidence, supports an inference of intentional discrimination.

The Board also asserts that Plaintiffs' anecdotal evidence does not show the Board had discriminatory intent because it does not include evidence of any derogatory remarks or specific instances of race discrimination. *Cf. Teamsters*, 431 U.S. at 337 (evidence included forty specific examples of individual discrimination); *King v. Gen. Elec. Co.*, 960 F.2d 617, 627 (7th Cir. 1992) (plaintiffs presented only "meager anecdotal evidence" and so "failed to provide the amount of anecdotal evidence claimants in other cases have supplied to support a finding of a pattern or practice of discrimination"). While the lack of such evidence may call into question Plaintiffs' ability to prove their claims, the Court cannot conclude that it wholly negates Plaintiffs' claims. As for what anecdotal evidence Plaintiffs presented, the Board presents counterevidence showing that some of the schools selected for turnaround did not have a majority of African American teachers and PSRPs, that other schools not selected for turnaround had a greater percentages of African American teachers and PSRPs than those selected for turnaround, and that the Board rehired African American and Caucasian CTU members affected by the 2012 turnarounds at approximately the same rate. The Board also argues that, contrary to Plaintiffs' contention, the evidence shows that the turnarounds did improve student performance. The Board's evidence only underscores that a jury must consider the disparate treatment claims, with the anecdotal evidence presenting a question of fact as to whether the Board had the required intent to discriminate against African American teachers and PSRPs when choosing which schools to turn around. Therefore, the Court cannot grant summary judgment for either Plaintiffs or the Board on the disparate treatment claims.

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiffs' and the Board's motions for

summary judgment [302, 304].

Dated: March 17, 2021

                                                  _____

                                                  SARA L. ELLIS

                                          United States District Judge